THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL FRANKLIN, Defendant-Appellant.

First District (4th Division)    No. 62351

Opinion filed September 8, 1976.

Ira A. Moltz, of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris E. Sholder, and Randolph T. Kemmer, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The defendant, Michael Franklin, was charged by indictment with the commission of the offenses of murder and attempt armed robbery in violation of sections 9—1 (Ill. Rev. Stat. 1969, ch. 38, par. 9—1) and 8—4 (Ill. Rev. Stat. 1969, ch. 38, par. 8—4) of the Criminal Code, respectively. Following his first trial, which resulted in a hung jury, the defendant was retried in another jury trial and was found guilty of both offenses. Subsequent to a hearing in aggravation and mitigation, the defendant was sentenced to concurrent prison terms of 35 to 105 years for murder and 6 to 18 years for attempt armed robbery. On appeal, the defendant challenges his convictions as well as the sentence he received on the murder count on the respective bases that (1) he was denied his right to a speedy trial when the trial court erroneously granted the State's request for an extension of the Fourth Term; (2) the prosecutor's conduct during the trial and his closing comments were improper and deprived him of a fair and impartial trial; and (3) since there was no justification in the harsh sentence he received for the offense of murder, his prison term should be reduced to 14 to 42 years.

A review of the record reveals that on the night of April 23, 1971, Samuel Brown was shot and killed by an unknown assailant subsequent to driving his daughter and grandchildren back to their home. Although the police officers, who investigated the homicide, were initially unable to discern who had shot Mr. Brown, a police firearms expert determined that a .32 caliber revolver, which had been recovered four days later from Stanley Bell and Otis Brown following their arrest for armed robbery, was the same weapon which killed Samuel Brown. While both Brown and Bell originally informed the police on May 3, 1971, that the gun was taken from a "winehead" two days prior to their arrest, they later admitted that their story was fictitious. Moreover, during the course of each individual's interrogation, the police received information regarding the identity of the individual who shot and killed Samuel Brown.

In response to the police officer's inquiries, Stanley Bell told them that on April 23, 1971, the defendant had asked him if he could borrow a .32 caliber revolver because he wanted to make some money to go bowling. After informing the defendant of the whereabouts of the gun, Bell proceeded to the bowling alley. At approximately 10 p.m., the defendant came into the bowling establishment and informed Bell that he had just shot a man in the neck while trying to rob him. He also related that he

placed the gun back on Bell's porch where he originally found it. A few days later, the defendant came over to Bell's house and requested and received the spent cartridge from the gun so that he could "wear [it] around his neck."

Subsequent to both Bell and Brown voluntarily signing a statement obtaining their knowledge about the incident on April 23, 1971, the police attempted to locate the defendant and left a message at his home that they wished to speak with him. At approximately 10 p.m. on the same date that Bell and Brown were interrogated, the defendant entered the police station on his own volition and was met by Investigators Charles Grunhard and Peter Valesares. The defendant was then escorted into one of the offices in the station by Investigator Valesares and Detective John Sullivan and, after being advised of his constitutional rights to which he acknowledged his understanding, he was questioned about Samuel Brown's murder.

While the defendant initially denied any knowledge of the shooting, he stated (subsequent to being informed that Otis Brown told the police that he (the defendant) shot Samuel Brown) that he was near the scene of the shooting, and that Otis Brown was responsible for the victim's death. After Investigator Grunhard entered the room and the defendant related the same information he told the other police officers, the investigators decided to confront the defendant and Otis Brown. The two individuals met in the hallway of the station where the defendant accused Brown of being the assailant. Brown denied such accusation and then responded. "Why don't you just tell him you shot him. They already know everything * * *." Investigators Grunhard and Valesares both observed that the defendant appeared to be nervous and when the latter investigator ushered him back into the office, he stated "I did not mean to kill the man," and started to cry.

The defendant was indicted by the November 1971 grand jury of the circuit court of Cook County for the offenses of murder (Ill. Rev. Stat. 1969, ch. 38, par. 9—1) and attempt armed robbery (Ill. Rev. Stat., 1969, ch. 38, par. 8—4). On December 8, 1971, the defendant entered a plea of not guilty to said charges at his arraignment. After various pre-trial discovery motions submitted by both sides, the cause proceeded to trial in January 1973 and resulted in a hung jury and the declaration of a mistrial on January 31, 1973. By order of the trial court, the action was continued to February 9, 1973. Moreover, between February 19, 1973, and June 8, 1973, the case was continued several times either by agreement or on the defendant's motion. However, on June 8, 1973, the defendant answered ready for trial, thus commencing the 120-day period in which the proceeding was required to be held. (Ill. Rev. Stat. 1973, ch. 38, par. 103—5(a).) On October 1, 1973, just four days prior to the end of

the above time period, the State moved for a 28-day extension of the Fourth Term which was objected to by the defendant. An evidentiary proceeding then ensued on October 4, 1973, and, after hearing investigators from the Cook County sheriff's police testify as to their unsuccessful efforts to locate Stanley Bell for the purposes of serving him a subpoena, the trial court granted the State's request and set the cause for trial on November 1, 1973.

On that date, the State commenced its case-in-chief by calling Samuel Brown's wife, daughter and son. At the completion of their examinations, testimony was elicited from several individuals including Stanley Bell[1], Otis Brown, Investigators Valesares and Grunhard, and the assistant State's Attorney who interrogated the defendant at the police station. Besides each individual testifying as to his involvement in the action, Otis Brown related that subsequent to his arrest for the armed robbery, Stanley Bell told him that he (Bell) hoped the gun would not come back "hot" because it was the same gun which the defendant had used to shoot a man. He also stated that a few days after the attempted robbery of the tavern, the defendant shouted an obscenity at him because he had been arrested with the "hot" weapon. Moreover, Investigator Valesares expounded that the defendant gave a definitive account in the police station of what transpired on April 23, 1971, without being first informed as to (1) the location of the victim's body nor (2) that the victim was sitting in a car when he was shot.

At the conclusion of the assistant State's Attorney's testimony, the State rested its case. After the trial court denied the defendant's motion for a directed verdict of not guilty, defense counsel proceeded to call various witnesses in his client's behalf. Richard Banks was the first witness called and he indicated that on the night in question, he saw the defendant at the home of Joyce Harris where he (Banks) was playing pool from 6 p.m. until 9:30 p.m. Such account of the defendant's whereabouts was corroborated by Joyce Harris who testified on direct examination that the defendant was at her home from 2 p.m. until 9:30 p.m. on April 23, 1971. On cross-examination, she testified that the defendant was the father of her child who was born approximately two weeks after the incident.

Subsequent to the defendant's mother testifying that her son told her at the police station that he informed the police that he "did it," the defendant took the stand in his own behalf. Besides stating that he was at

---

[1] It is important to note that when the trial commenced, Stanley Bell was not present in the courtroom. On November 2, 1973, Bell's parents and two brothers were brought before the trial judge to ascertain his whereabouts. His parents informed the court that they had talked to their son and told him that a judge had ordered him to appear in court but he refused. Thereafter, a bench warrant was issued for Stanley Bell's arrest. Bell was subsequently arrested and placed in the witness quarters of the Cook County jail until he testified on November 7, 1973.

Joyce Harris' house from 2:30 p.m. until 9:30 p.m. on April 23, 1971, the defendant unequivocally denied that he (1) attempted to rob or shoot Samuel Brown on the date in question; (2) had a conversation with Stanley Bell on such date in which he requested the latter's .32 caliber pistol; or (3) saw Otis Brown at the police station or that he accused him of having shot Samuel Brown. He expounded that when he was interrogated at the station by some investigators and the State's Attorney, he reaffirmed his lack of knowledge of the murder. However, he said that due to the repetitive questions as well as the threatening remarks made by the police, he became mad and told Investigator Valesares and then the State's Attorney that "if he wanted to make it that way I shot the man." Moreover, on cross-examination, the defendant acknowledged that he told his mother he had stated that he shot the man.

The defense rested at the conclusion of the defendant's testimony. The State then called three rebuttal witnesses. The first was Stanley Bell's brother who testified that he was present at the bowling alley on April 23, 1971, when the defendant came in and admitted that he was trying to rob an individual and while they were struggling, the gun went off. His testimony was succeeded by that of Investigator Valesares and the State's Attorney who questioned the defendant at the police station. Both individuals denied that the defendant ever told them during the course of their interrogations that "if that is the way you want it, then I did it." Thereafter, counsel for both sides presented their closing argument and the trial court instructed the jury. On November 15, 1973, the jury returned verdicts of guilty on both the murder and attempt armed robbery counts. Defense counsel then moved for a new trial as well as a pre-sentence investigation. The former post-trial motion was denied on December 19, 1973, and, after a hearing in aggravation and mitigation, the defendant was sentenced to concurrent prison terms of 35 to 105 years for the offense of murder and 6 to 18 years for the attempt armed robbery conviction. A timely notice of appeal was then filed with the circuit court of Cook County on January 2, 1974.

We first consider the defendant's contention that he was denied his right to a speedy trial when the trial court erroneously granted the State's request for an extension of the Fourth Term. In support of such assertion, the defendant maintains that due diligence was not exercised by the State in locating Stanley Bell before the expiration of the Fourth Term. He argues that the State knew that it was dealing with a noncooperative witness as evinced by the difficulty it had in getting Bell to testify at the first trial. Moreover, the fact that the State (1) waited until September 19, 1973, to locate him and (2) made no effort to find him on September 20, 1973, September 25, 1973, September 26, 1973, or between September 29, 1973, to October 4, 1973, the day of the extension hearing, adds further

credence to his position that the State did not exert due diligence and hence, violated his right to a speedy trial. We are not in accord.

■■   Pursant to section 103—5(a) of the Criminal Code, any person in custody for an alleged offense is required to be brought to trial within 120 days from the date he was taken into custody unless such person causes a delay in the proceedings. (Ill. Rev. Stat. 1973, ch. 38, par. 103—5(a).) However, (1) where the State has exercised due diligence to obtain material evidence and (2) there are reasonable grounds to believe that such evidence may subsequently be obtained, the legislature has delineated an exception to this 120-day rule and the court may continue the cause for a maximum of 60 additional days. (Ill. Rev. Stat. 1973, ch. 38, par. 103—5(c).) Moreover, judicial construction of this latter legislative enactment has indicated that whether the above prerequisites have been satisfied rest within the sound discretion of the trial court and its determination will not be disturbed on review unless there has been a clear abuse of that discretion. (*E.g., People v. Shannon*, 34 Ill. App. 3d 185, 186, 340 N.E.2d 129, 131; *People v. Moore*, 27 Ill. App. 3d 337, 340, 326 N.E.2d 420, 422.) In ascertaining whether such discretion has been abused, reviewing courts must view the trial court's decision in light of the situation as it existed at the time the matter was presented to the trial court and not as it might appear in retrospect or in view of subsequent events. *E.g., People v. Arndt*, 50 Ill. 2d 390, 393, 280 N.E.2d 230, 232; *People v. Poland*, 22 Ill. 2d 175, 178, 174 N.E.2d 804, 805.

Applying these legal precepts to the case at bar, it is apparent that there was ample evidence of the State's due diligence in attempting to locate Stanley Bell so as to warrant a 28-day extension of the Fourth Term. As the record revealed, at the hearing conducted on October 4, 1973, the State produced four members of the Cook County sheriff's police who respectively testified as to their concerted but unsuccessful efforts to serve Stanley Bell with a subpoena to appear at the defendant's trial. Investigator John Dalcason testified that on September 19, 1973, he attempted to serve Bell with a subpoena but the address he was given turned out to be the locale of an abandoned insurance office. Such fruitless effort was succeeded on September 22, 1973, when Investigator Gerald Walsh went with his partner to an address on South Michigan Avenue. When they reached such destination, they engaged in a conversation with Stanley Bell's two brothers who informed them that Bell was staying at an apartment building located on the 7100 block of South Bennett in Chicago. Upon arriving at the building, Investigator Walsh noticed the name of Bell on the mail box, but was unable to find him after knocking on the corresponding apartment door. On September 23, 1973, and September 24, 1973, Investigator Michael Baldwin and his partner visited the same apartment building and were equally

unsuccessful in gaining entrance into the apartment where the defendant was allegedly an inhabitant.

The final attempt to serve Bell with a subpoena occurred on September 28, 1973, when Investigator Charles Davis gained entrance to the apartment located on Bennett and spoke with Bell's sister-in-law. She informed him that (1) Stanley Bell did not live in her apartment and (2) she was unaware of his whereabouts. Although she took the investigator's name in case something arose, neither she nor Bell himself contacted Davis subsequent to that occasion.

■■ Considering the above evidence, we believe that the trial judge's decision did not amount to an abuse of discretion. Analogous to prior decisions (*e.g., People v. Bey*, 12 Ill. App. 3d 256, 298 N.E.2d 184), the instant case involved repeated conscientious efforts on the part of law enforcement officials to locate Stanley Bell for the purpose of serving him a subpoena. As the evidence presented by the State at the hearing showed, (1) Bell's known addresses were visited frequently, (2) his family and friends were extensively questioned concerning his whereabouts and (3) numerous investigators were employed to locate Bell. Moreover, in light of the facts that (1) there was no evidence elicited at the hearing showing that Bell left the State and (2) Bell did testify at the defendant's first trial, there were reasonable grounds to believe that he could be found at a future date. We therefore conclude that the defendant's right to a speedy trial was not abridged and the granting of the 28-day extension of the Fourth Term was proper.

We are also of the opinion that there is no propriety to the contention that the prosecutor's course of conduct during the trial as well as his closing argument infringed the defendant's right to a fair and impartial trial. While the defendant cites eight instances in which the prosecutor's comments or closing remarks allegedly deprived him from receiving a fair trial, it is well settled in Illinois that even though every defendant is entitled to a trial that is free from improper comments or arguments that engender prejudice, his verdict will not be disturbed on review where such remarks did not (1) constitute a material factor in his conviction or (2) result in substantial prejudice to the accused. (*E.g., People v. Lewis*, 38 Ill. App. 3d 995, 999, 349 N.E.2d 528, 532; *People v. Davis*, 38 Ill. App. 3d 411, 347 N.E.2d 818, 824; *People v. Walker*, 29 Ill. App. 3d 838, 841, 331 N.E.2d 267, 270.) Moreover, in determining whether the prosecutor's comments or arguments constitute prejudicial error, the test employed is whether the jury would have reached a contrary verdict had the improper remarks not been made. (*E.g., People v. Davis*, 46 Ill. 2d 554, 560, 264 N.E.2d 140, 143; *People v. Oliger*, 32 Ill. App. 3d 889, 892, 336 N.E.2d 769, 772.) Although the defendant claims that in various instances, the prosecutor's comments or closing remarks deprived him of a fair trial, we

believe that in light of the above precepts as well as the ones subsequently enunciated, the defendant's assertion does not warrant a reversal of his conviction.

The defendant's initial chastisement of the prosecutor's conduct centers around the latter's remarks made during the redirect examination of Stanley Bell in which the following exchange took place:

"Q. Now, the Defense Attorney asked you a lot of questions about your character and everything. Whatever you are or whatever you have done you were good enough for Michael Franklin to hang around with you. Is that correct?

Mr. Bellows: Object.

The Court: Sustained.

Mr. Karahalios: Q. Did you and Michael Franklin go around together?

A. Yes, we did.

Q. When the Defense Attorney asked you about using that gun in an armed robbery he said, 'Are you proud of yourself?' Were you ever so proud that you asked to see the shell casing—

The Court: Objection sustained.

Mr. Karahalios: Q. Was Michael Franklin acting proud when he asked to have the shell casing to hang around his neck?

Mr. Bellows: Objection.

The Court: Sustained."

In maintaining that such line of inquiry was grossly improper, the defendant contends that the above portion of Bell's redirect examination was analogous to the questions posed by the prosecutor in *People v. Nuccio*, 43 Ill. 2d 375, 253 N.E.2d 353, wherein a substantial series of unsupported insinuations of misconduct were condemned by the Supreme Court. We disagree.

As the State correctly points out in its brief, the decision in *Nuccio* is not dispositive of the defendant's assertion since such opinion is factually distinguishable from the instant case. Contrary to the situation in *Nuccio*, the case at bar did not entail a persistent pattern of prejudicial and unsupported remarks by the prosecutor when he was examining witnesses. Rather, the prosecutor submitted a few questions on redirect to counteract defense counsel's attempt to discredit Stanley Bell's credibility on cross-examination.

██ Besides the decision in *Nuccio* being factually inapposite to the matter in controversy, it is also important to note that a prosecutor is permitted to comment on or inquire about evidence adduced at trial and may draw reasonable inferences from such evidence, even if those inferences are unfavorable to the defendant. (See *e.g., People v. Delgado*, 30 Ill. App. 3d 890, 897, 333 N.E.2d 633, 639; *People v. Etten*, 29 Ill. App.

3d 842, 846, 331 N.E.2d 270, 274.) Here, there was evidence elicited at trial that the defendant and Bell were friends for approximately two or three years and did socialize together. Moreover, Bell testified on direct examination that a few days following the April 23, 1971, incident, the defendant came to his home and asked him for the shell casing so that he could hang it around his neck. Thus, it is apparent that the controverted questions proffered by the prosecutor were supported by the evidence presented at trial and coupled with the absence of a persistent pattern of prejudicial suggestions by the prosecutor, there is no merit to the defendant's argument.

■■ We further believe that the above precept permitting a prosecutor to comment on or inquire about certain evidence adduced at trial is dispositive of the defendant's contention that the prosecutor persistently insinuated during the redirect examination of Investigator Valesares that he did not sign any statement.[2] While we agree at the outset with the defendant that it was not incumbent upon him to sign any statement that he killed Samuel Brown, we are of the opinion that the prosecutor's inquiry as to whether Otis Brown's brother, Stanley Bell's mother, or the defendant's motion allowed any of them to sign a written statement did not prejudice the defendant. As the record revealed, not only did Otis Brown and Stanley Bell sign written statements concerning their

---

[2] The controverted portion of the investigator's redirect examination is as follows:

"Q. Now, Mr. Bellows also asked you if there was a relative of Stanley Bell's there that evening in the police station. Is that correct?

A. Correct.

Q. I think you said it was his mother.

A. I thought it was his mother. I wasn't certain of the relationship.

Q. And there was also a brother or brother-in-law of Otis Brown there that evening. Is that correct?

A. I assume it was his brother-in-law, but it was his brother.

Q. And Otis Brown's brother allowed him to sign a written statement, did he not?

MR. BELLOWS: Objection.

THE COURT: Objection sustained.

MR. KARAHALIOS: Q. Stanley Bell's mother allowed him to sign a written statement?

MR. BELLOWS: Objection.

THE COURT: Sustained.

MR. KARAHALIOS: Q. Michael Franklin's did not want him to get anything down in writing, is that correct?

MR. BELLOWS: Objection.

THE COURT: Sustained.

MR. KARAHALIOS: I have no further questions.

MR. BELLOWS: May I be heard?

(Whereupon the following proceedings were had outside the presence and hearing of the jury.)

MR. BELLOWS: Judge, I have another motion for a mistrial. There is nothing that says a person has to sign a confession or make a statement.

MR. KARAHALIOS: I didn't say that was the law. It is in evidence. That is what Mrs. Franklin did. I asked that question. As a matter of fact, it went into evidence unobjected to."

knowledge of Samuel Brown's murder, but the respective relative of each individual was present at the police station on May 3, 1971, the night they were interrogated by the police. Moreover, Investigator Valesares testified at trial that the defendant had made separate oral statements to him as well as to Investigator Grunhard. Hence, since the prosecutor's questions were addressed to certain evidence that was introduced during the course of the trial, we find that such line of inquiry was not so damaging and prejudicial as to require a reversal of the defendant's conviction.

■■ The defendant next claims that the respective portions of the cross-examinations of Investigator Valesares, Joyce Harris, and himself created prejudice in the mind of the jury against him. With regard to Investigator Valesares, it is argued that when defense counsel was cross-examining him regarding the time he commenced his interrogation of the defendant, the prosecutor (1) objected to such inquiry as not being a fair statement of the officer's evidence and (2) then remarked to his adversary, "You still have to stick to the truth." The defendant contends that the effect of such latter comment was to accuse defense counsel of lying and making up the defense's case. However, in light of the facts that the trial court (1) admonished the prosecutor that such comment was uncalled for, (2) immediately instructed the jury to disregard "any comments made by the attorney," and (3) diligently attempted to prevent either counsel from making a similar statement during the remainder of the trial, we do not believe that the prosecutor's comments were so improper and prejudicial as to require a reversal.

■■ We are also not persuaded that the prosecutor's cross-examination of Joyce Harris deprived the defendant of a fair trial. While the defendant maintains that it was improper for the prosecutor to elicit from Miss Harris that the defendant fathered her child out of wedlock, it must be remembered that a prosecutor is afforded wide latitude in cross-examining a witness concerning the latter's relationship with a defendant since the possible bias of a witness is always material and the relationship to a defendant is clearly a possible basis for bias. (*E.g., People v. Jones*, 60 Ill. 2d 300, 306, 325 N.E.2d 601, 604; *People v. Barr*, 51 Ill. 2d 50, 51-52, 280 N.E.2d 708, 710.) Considering such precept in light of the instant case, it is evident that the prosecutor's inquiry was not designed to prejudice the defendant by showing his sexual conduct and destroying Joyce Harris' credibility through her sexual conduct. As the record revealed, defense counsel elicited from Joyce Harris on direct examination that she had known the defendant for two years prior to the date of Samuel Brown's death. However, such testimony was preceded by defense counsel's direct examination of Richard Banks in which the latter remarked that the defendant was Joyce Harris' boyfriend. In view of such testimony, we

believe that the prosecutor's inquiry of Joyce Harris as to whether the defendant was the father of her child, did not exceed the bounds of cross-examination; rather, the witness' relationship to the defendant served as a possible basis for bias.

Besides claiming that he was prejudiced by the cross-examination of Investigator Valesares and Joyce Harris, the defendant further contends that the most outrageous abuse by the State occurred during his own cross-examination when the following interrogation ensued regarding the statements he made to his mother at the police station:

"Q. Did you talk to your mother after some minimum period when Valesares came in?

A. Yes.

Q. Did you tell her that you had made that statement to the Assistant State's Attorney?

"A. I told her I stated I shot the man, just what I said.

Q. You told her that—is that what you just told the ladies and gentlemen? That was a little slip?

MR. BELLOWS: I'm asking Counsel—He has been constantly arguing. He has been marching up and down in this courtroom, advancing on the witness with his gesturing with his finger.

MR. KARAHALIOS: Objection to the speeches.

THE COURT: He may ask the question.

MR. KARAHALIOS: Q. Did you just say in the beginning part of your answer I told my mother that I shot the man?

THE WITNESS: A. You wouldn't let me finish.

Q. That is—Did you just tell the ladies and gentlemen of the jury that—

A. Well, I shot the man.

Q. When your mother came in, did you just testify that when your mother came in—

MR. BELLOWS: He has not.

THE COURT: Will you ask him the question?

MR. KARAHALIOS: Q. Did you just tell the jury when your mother came in, you told her you shot the man?

MR. BELLOWS: The jury heard the question.

THE COURT: Will you rephrase the question and ask the question relating to the incident?

MR. KARAHALIOS: Thank you, your Honor.

Q. Was that a little slip, what you told the jury?

MR. BELLOWS: Objection.

THE COURT: Sustained."

He urges that the prosecutor's conduct in twice asking him if "that wasn't a little slip" after he said he told his mother that he shot a man, strongly

implied that he made an in-court admission that he should not have rendered. We cannot accept such position.

It is well established in this State that the latitude allowed in cross-examining a witness rests within the sound discretion of the trial court and only where there is a clear abuse of discretion resulting in manifest prejudice to the defendant will a reviewing court interfere with the trial court's decision. (*E.g., People v. Jones,* 34 Ill. App. 3d 103, 107, 339 N.E.2d 485, 488; *People v. Hayes,* 32 Ill. App. 3d 953, 959, 337 N.E.2d 280, 284.) The defendant maintains that the State twisted his testimony regarding what he told his mother. It is argued that the prosecutor attempted to convince the jury that he told his mother that he shot the man when in fact all he told his mother was that he told the police that he shot the man. We do not find any confusion in the previously cited line of inquiry. The responses of the defendant in the above colloquy indicated that he talked to his mother and informed her that he had stated that he shot a man. Moreover, the fact that defense counsel never attempted on redirect examination to clarify the meaning of the defendant's statements lends credence to the position that there was no uncertainty to his responses. Thus, we believe that manifest prejudice did not result from such interchange so as to warrant a judgment contrary to that enunciated by the trial court.

The defendant also claims that various portions of the prosecutor's closing argument deprived him of a fair and impartial trial. He initially contends that the prosecutor's statement during rebuttal, in which he remarked "when you have to defend someone, * * * [y]ou must say something to the jury,[3] implied that defense counsel really had no case and was attempting to trick the jury. We cannot subscribe to such connotation.

---

[3] The relevant portion of the prosecutor's rebuttal argument is as follows:

"The evidence of the testimony that you heard from the witness stand, the evidence of real objects that are introduced in this case. That and that alone is what you are to base your decision and your verdict on and after the Court tells you that that is what, in fact, the law is.

After listening to counsel's argument I now see the reason for that rule and I listened very attentively to what Mr. Bellows said. And when he told you that you are going to have to take Valesares' word in this case, that that is what this case is. That is the whole case and because of that you have wasted two weeks, I am saddened. I am saddened because that is not what the evidence shows and that is not what this case is about at all. But I supposed when you have to defend someone, when you have to defend someone when the evidence—

MR. BELLOWS: Objection.

MR. KARAHALIOS: Whom the evidence has shown is guilty—

THE COURT: Objection sustained.

MR. BELLOWS: Your Honor, there has been an objection. It has been sustained. I ask Counsel to desist from the line of argument.

THE COURT: You may argue based upon the evidence.

MR. KARAHALIOS: Thank you, your Honor.

■■ It has uniformly been held that a prosecutor has great latitude in presenting his closing argument. (*E.g., People v. Oliger*, 32 Ill. App. 3d 889, 893, 336 N.E.2d 769, 772; *People v. Hering*, 27 Ill. App. 3d 936, 944, 327 N.E.2d 583, 590.) Moreover, reviewing courts are reluctant to set aside a verdict on the grounds of remarks made during closing argument and do so only where these remarks are clearly prejudicial, such as (1) an expression of the prosecutor's personal belief as to the defendant's guilt, (2) a comment upon the defendant's failure to testify or (3) attacks upon the defendant or his counsel which are inflammatory in the extreme. (*People v. Starr*, 37 Ill. App. 3d 495, 500, 346 N.E.2d 410, 414.) Further, in determining whether a prosecutor's closing comments are prejudicial, reference must be made to the content of the language used, its relation to the evidence, and the effect of the argument on the rights of the accused to a fair and impartial trial. (*People v. Mitchell*, 35 Ill. App. 3d 151, 164, 341 N.E.2d 153, 163.)

■■ Applying these tenets to the case at bar, the controverted closing remarks made by the prosecutor cannot be considered reversible error. Contrary to the decision relied on by the defendant (*People v. Stock*, 56 Ill. 2d 461, 309 N.E.2d 19), the instant case did not involve a situation where the prosecutor blatantly and repeatedly attacked the integrity of the defense counsel as well as commented on the defendant's failure to take the stand. Moreover, the record is devoid of any instance in which the prosecutor rendered his own personal opinion of the defendant's guilt. While we do not controvert that the prosecutor's remarks were addressed to defense counsel, we believe that in light of the language used and its relation to the evidence presented at trial, such comments were not inflammatory and hence, did not prejudice the defendant.

The defendant further denounces the prosecutor's respective references in his closing argument to the family of Samuel Brown as well as the testimony of Richard Banks. With regard to the latter subject, it is argued that the prosecutor's comments concerning the failure of Banks to

Again, as I was saying, as the evidence has shown in this case, that that man is guilty. You must say something to the jury. You have got to. You have got a confession. You have got the murder weapon. You have got the deadly bullet, the bullet that in fact, caused the death in this case.
You have got all of that recovered. You must get up and you must say something.
MR. BELLOWS: Your Honor, I am going to continue my objection.
MR. KARAHALIOS: This is rebuttal.
THE COURT: You may argue.
MR. KARAHALIOS: This is what the evidence showed.
MR. BELLOWS: Your Honor, may I be heard?
THE COURT: I have sustained your objection.
MR. BELLOWS: Well, I would like the Court to instruct—
MR. KARAHALIOS: May I continue, Judge?
THE COURT: You may argue as to the evidence."

present his alibi defense prior to trial implied to the jury that the defendant was obligated to offer a defense at the police station and since he failed to do so, it was too late to offer it at trial.[4] Moreover, the defendant maintains that the prosecutor's statements about the family of the deceased[5] were extremely prejudicial since some of them (1) were witnesses to the event in question nor (2) had any idea of the identity of the assailant. However, since the trial court sustained an objection in each instance to the disputed statement made by the prosecutor and instructed the jury to disregard the comment, we believe that any error in the above arguments was cured. *E.g., People v. Olivas*, 41 Ill. App. 3d 146, 354 N.E.2d 424; *People v. Hamilton*, 27 Ill. App. 3d 249, 254, 327 N.E.2d 35, 39-40.

■■ Even assuming *arguendo*, that such curative measures were not undertaken by the trial court, we are of the opinion that the controverted statements did not prejudice the defendant. While the defendant assails the prosecutor's comments about Richard Banks, it has consistently been held in this State that in his closing argument to the jury, a prosecutor may discuss the witnesses and their credibility. (*E.g., People v. Harris*, 33 Ill. App. 3d 600, 604, 338 N.E.2d 129, 132; *People v. Oden*, 26 Ill. App. 3d 613, 617, 325 N.E.2d 446, 449.) As the record revealed, there were conflicting accounts regarding the defendant's whereabouts on the night Samuel Brown was shot and killed. On one hand, the testimony elicited from the witnesses called by the State clearly indicated that the defendant had shot and killed Samuel Brown near the home of the victim's daughter. In contradistinction to such evidence, Richard Banks and the defendant himself presented an alibi defense at trial that the latter was present in Joyce Harris' home at the time the incident took place. Based on the disparity between the above version of the defendant's presence on April

---

[4] The disputed portion of the prosecutor's closing argument is as follows:
"That is it. That is it. When did we hear about this testimony? Did we hear about this person's presence when the defendant was brought into the station? Did we hear about this person's presence when the defendant was charged? Did we hear about this person's presence—
MR. BELLOWS: Object, your Honor.
THE COURT: Sustained.
MR. KARAHALIOS: Did we hear about this person coming forth at any time prior to trial?
MR. BELLOWS: I move that Counsel's remarks be stricken.
THE COURT: It may be stricken. The jury is instructed to disregard."
[5] The prosecutor's reference to the victim's family is contained in the following statement:
"Did the family of this man come in and lie against this defendant? Wouldn't they want to see the real killer caught? You bet your life.
MR. BELLOWS: Objection to that.
THE COURT: Sustained.
MR. KARAHALIOS: They are not going—
MR. BELLOWS: Move it be stricken.
THE COURT: The jury is instructed to disregard the comments."

23, 1971, and the one he gave to the investigators and the State's Attorney at the police station on May 3, 1971, we believe that the prosecutor's comments were addressed to the credibility of Richard Banks and did not constitute reversible error.

We also feel that the defendant's criticism of the prosecutor's remarks concerning the victim's family is untenable. Although references to the surviving family of a deceased in a murder case have been condemned in prior adjudications (*e.g., People v. Wilson*, 51 Ill. 2d 302, 306, 281 N.E.2d 626, 628; *People v. Bernette*, 30 Ill. 2d 359, 371-72, 197 N.E.2d 436, 443-44), a defendant is not automatically entitled to a new trial merely because a prosecutor comments on this subject in his closing argument since, dependent upon the facts, such a statement can be harmless. (*E.g., People v. Jordan*, 38 Ill. 2d 83, 91-93, 230 N.E.2d 161, 166; *People v. Wilson*, 32 Ill. App. 3d 842, 847, 336 N.E.2d 92, 96.) Here, while Samuel Brown's family did not witness his death, their testimony at trial was principally addressed to the place and circumstances surrounding the discovery of Brown's body. In fact, the defendant confirmed the testimony of Brown's daughter regarding the events leading up to the incident when he recounted what transpired on April 23, 1971, at the police station. Thus, even though the family members were not initially cognizant of the defendant's identity, the prosecutor's reference to them did not subject the defendant to extreme prejudice so as to warrant a reversal of his conviction.

In sum, the eight controverted remarks made by the prosecutor did not deprive the defendant of a fair and impartial trial. Besides the above analysis demonstrating that each statement did not result in substantial prejudice to the defendant, the record also shows that in light of the overwhelming evidence adduced at trial illustrating that the defendant shot and killed Samuel Brown, such comments were not a material factor in his conviction. Moreover, the fact that the defendant did not argue on review that there was a reasonable doubt as to his guilt adds further credence to the position that the prosecutor's conduct or closing argument did not influence the jury in its decision. We therefore conclude that the jury would not have reached a contrary result even if the prosecutor's disputed statements had not been made.

■■ Finally, we cannot accept the defendant's contention that his sentence for murder should be reduced to 14 to 42 years. The authority of reviewing courts to reduce sentences imposed by trial courts should be applied with considerable caution (*e.g., People v. Drew*, 32 Ill. App. 3d 682, 684, 336 N.E.2d 281, 283; *People v. Reno*, 32 Ill. App. 3d 754, 759, 336 N.E.2d 36, 39) and should not be implemented unless the sentence is greatly at variance with the purpose and spirit of the law or extremely disproportionate to the nature of the crime (*e.g., People v. Wright*, 56 Ill.

2d 523, 536, 307 N.E.2d 537, 543-44; *People v. Perry*, 38 Ill. App. 3d 81, 85, 347 N.E.2d 340, 344). Some factors to be considered in reviewing sentences imposed by the trial court are (1) the seriousness of the crime at bar, (2) any prior convictions, (3) the defendant's natural inclination or aversion to commit crime, and (4) the stimuli which motivated his conduct. *E.g., People v. Morgan*, 59 Ill. 2d 276, 282, 319 N.E.2d 764, 768; *People v. Dukett*, 56 Ill. 2d 432, 452, 308 N.E.2d 590, 601.

Applying these tenets to the case at bar, we are of the opinion that the defendant's sentence should not be reduced. While the defendant complains that his sentence is excessive due to his age (16 at the time of his incarceration) and likelihood of rehabilitation we believe that his sentence was justified in light of the above mentioned factors. Not only was the defendant convicted of perhaps the most serious offense an individual can commit, his stimulus for such conduct, namely, to get some money to go bowling, warrants the sentence he received. Moreover, it was brought out during the hearing in aggravation and mitigation that a finding of delinquency was entered against the defendant in a prior juvenile proceeding which stemmed from the latter's armed robbery of another individual. Further, considering that (1) the trial court observed the defendant throughout the trial and diligently heard the arguments proffered by both sides during the hearing in aggravation and mitigation and (2) under the present rules and regulations of the Department of Correction, the defendant would be eligible for parole in 11 years and three months from the date of his arrest in 1971 (Ill. Dept. of Corr., Adult Div., Admin. Reg. No. 813) we conclude the sentence of 35 to 105 years for murder should not be disturbed.

For the reasons stated herein, the judgment of the trial court is affirmed.

Affirmed.

JOHNSON, P. J., and DIERINGER, J., concur.