THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CHESTER HAWKINS *et al.*, Defendants-Appellants.

First District (3rd Division)　No. 78-502

Opinion filed August 27, 1980.

Ralph Ruebner and Andrew Berman, both of State Appellate Defender's Office, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Pamela Louise Gray, and Diane Michel Powell, Assistant State's Attorneys, of counsel), for the People.

Miss PRESIDING JUSTICE McGILLICUDDY delivered the opinion of the Court:

Chester Hawkins and Ralph Watts, the defendants, were charged by indictment with attempt murder, aggravated battery and armed robbery.[1] Following a jury trial, they were convicted of aggravated battery and each defendant was sentenced to serve three years, four months to 10 years in the penitentiary.

The defendants raise four issues on appeal: (1) whether the trial court erred in refusing the defendants' request for a self-defense jury instruction; (2) whether the prosecutors made improper comments during closing argument that denied the defendants their right to a fair trial; (3) whether the trial court erred in denying Watts' motion to suppress a gun seized during a warrantless arrest; and (4) whether the trial court erred in refusing to strike the testimony of a witness whom the State sought to qualify as an expert.

Tony Hunter testified that on January 10, 1977, he was visiting Alonzo Shephard at the latter's one-room apartment. One gained access to the apartment by going through a barred door separating the common hallway

---

[1] Joyce Bradford was also charged in the indictments for the same crimes but her trial was severed from the defendants' trial.

from the stairwell exit and a wooden door between the apartment and hallway. Hunter stated that he and Shephard were watching television when they heard a knock on the stairwell door. Hunter answered the knock and found two men, identified in court as the defendants, holding a bag. They asked Hunter whether he wanted to buy some pants and he told them that he did not want to purchase any pants.

Approximately 10 seconds later, there was another knock on the door. Hunter recognized Joyce Bradford, an acquaintance. As he admitted her into the corridor, the two defendants appeared. Joyce asked Shephard to buy her some pants. Hunter testified that when Shephard refused the defendants pulled out guns and Watts said, "This is a stick-up. Go into the room." Watts then ordered Hunter to lie on the bed, which he did. Joyce Bradford also was lying on the bed. Hawkins ordered Shephard to lie on the floor face down. Watts asked Hunter for money; and when he replied he didn't have any, Watts took his wallet from his back pocket, checked it for money, and handed it back to Hunter telling him to wipe off the fingerprints. Hunter stated Watts was holding a large automatic weapon.

Hunter testified that Hawkins asked Alonzo Shephard for money; and after Shephard reached into his pocket for money, Hawkins shot him with a small revolver. Hawkins demanded more money and told Shephard, "You're dead anyway." Shephard crawled over to a closet to retrieve more money and give it to Hawkins. At this point, Shephard and Hunter were tied, hands behind their backs, with neckties. As the defendants discussed killing Shephard and Hunter, they heard a knock on the door. One of the defendants opened the door and Ray Price entered. Watts directed Hunter to move to the floor and ordered Price to lie on the bed. The defendants again discussed killing the three men. As Watts and Hawkins were leaving the room, Hunter heard a small sound, like a shot, then a louder noise, like a second shot, and then a yell from Price.

Alonzo Shephard's testimony corroborated the facts related by Hunter. He confirmed that he had been shot by Hawkins in the back while lying on the floor after giving him $16 from his pocket. Shephard also testified that after he heard two shots, Price, who was lying on the bed, said, "I'm shot; he shot me for nothing."

Ray Price was called to testify. The State attempted to qualify Price as a firearms expert to the extent that he could distinguish retort sounds produced by guns of different caliber. Thereafter, Price identified the two defendants in court and stated that when he entered Shephard's apartment, Watts was holding a .45-caliber revolver and Hawkins held what looked like a .22-caliber gun. He said he was told to lie on the bed and his hands were tied behind his back. Price testified that he glanced to his right to see a ".45 coming down" and identified Watts as the person holding the gun. He said he heard one shot and felt his leg jerk up off the bed and then heard another shot which sounded like it came from the hall. The State intro-

duced a .45-caliber automatic weapon into evidence and Price identified it as the one Watts held over him the night of January 10, 1977.

The State produced additional witnesses at trial. Since their testimony is not relevant to the issues presented on appeal, it will not be discussed.

As part of the defendants' case-in-chief, Chester Hawkins testified that Joyce Bradford and Ralph Watts were visiting his apartment when they decided to go to Alonzo Shephard's apartment to shoot dice. Watts and Hawkins dropped Joyce off at Shephard's apartment and went to a nearby tavern. The defendants returned to Shephard's apartment about an hour later, knocked three times on the door, as Joyce had instructed them to do, and Joyce opened the door for them. Upon entering the apartment, Hawkins said he observed Shephard, Price and Hunter snorting heroin. About 10 or 15 minutes later, Joyce made the introductions and Watts urged the parties to begin playing dice.

Hawkins testified that he and Watts were winning because they were using loaded dice. He stated that during the game, Hunter grabbed the dice and accused them of cheating. At this point, Hawkins said he noticed that Shephard had a pistol behind his back in his belt and he struggled with Shephard to get the gun. Hawkins testified that during the fight, he pushed Shephard's hand up and the pistol went off and then fell to the floor as they continued to struggle. While he and Shephard were struggling over the gun, Hawkins said he heard a shot in another part of the room but did not know what was happening there. When Hawkins stood up from the floor with the gun he obtained from Shephard, he saw Watts snatch a pistol from Joyce Bradford. Watts also picked up and pocketed ammunition which had fallen from Joyce's purse. Hawkins, Watts and Bradford departed; and Hawkins tossed Shephard's pistol into a park across the street.

Watts' testimony corroborated the facts alleged by Hawkins. Watts also stated that when Hunter discovered the dice were loaded, he grabbed Watts by the arm and a struggle ensued. At that time, Watts saw Hawkins "put the arm on Alonzo Shephard" and heard one shot fired. Breaking free from Hunter, Watts heard another shot fired and turned and saw Joyce Bradford with a .45-caliber gun. As he grabbed the gun from her, her purse fell open and bullets dropped from it. Watts said he picked up the bullets and put them and the gun into his pocket. Watts testified that he, Hawkins and Bradford left Shephard's apartment together. He stated he deposited the gun and bullets in a closet in his own apartment.

## I.

■■ The first issue on appeal is whether the trial court erred in refusing the request for a self-defense instruction.[2] It has been held that " '[a] defendant

---

[2] The State argues that the defendants waived this issue because the post-trial motion for a new trial was not specific. We have reviewed this argument but find defendant Watts' post-trial motion which alleged that the "court erred in the matter of giving and refusing instructions" was sufficiently specific to preserve the self-defense instruction issue for review.

in a criminal case is entitled to have the jury instructed on any legally recognized defense theory which has some foundation in the evidence, however tenuous.' " (*People v. Cruz* (1978), 66 Ill. App. 3d 760, 764, 384 N.E.2d 137, citing *People v. Looney* (1977), 46 Ill. App. 3d 404, 410, 361 N.E.2d 18; see also *People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31.) The defense of self-defense presupposes that the accused committed the act and invokes the defense as a justification. *People v. Smith* (1912), 254 Ill. 167, 98 N.E. 281; see *People v. Lahori* (1973), 13 Ill. App. 3d 572, 300 N.E.2d 761.

■■ The evidence presented in the instant case is insufficient to support a self-defense instruction. Chester Hawkins testified on direct examination that he saw a small pistol in Shephard's belt behind his back and, as he grabbed Shephard, he pushed Shephard's hand and the pistol went off while Shephard's hand was on the trigger. On cross-examination, Hawkins denied shooting Shephard and said he struggled with Shephard to prevent Shephard from shooting him. Similarly, there was no evidence to support a claim of self-defense by defendant Watts. On direct examination, Watts denied shooting anyone. On cross-examination, he said he thought Joyce Bradford shot Price in the leg and that he took the gun away from her after the shot was fired because he thought she was going to shoot someone else. Where the accused denies having fired the gun and where there is no testimony from the defendants' witnesses or the State's witnesses which could have been the basis for giving the self-defense instruction, as in the instant case, it was not error for the trial court to refuse the defendants' tendered instruction. *Bratcher*.

## II.

The defendants also contend that the prosecutors' closing arguments contained numerous references to facts not in evidence, expressions of personal beliefs and improper slurs on the defendants' characters thus depriving them of their right to a fair trial. Defendants object to one comment made by the prosecutor concerning the pants that the defendants allegedly sought to sell to Shephard and Hunter. The prosecutor recalled testimony that Joyce Bradford said "Don't forget the pants" when she and the two defendants were leaving Shephard's apartment. The jury was told not to forget the evidence the State could have used but which was not available. The defendants contend the purpose of that statement was to improperly discredit defendants' defense by referring to evidence which would support the State's case but which was not presented during the trial. The defendants also object to the prosecutor's discussion of the two shots fired from the second gun, one of which struck Ray Price. The prosecutor stated the other shot was probably meant for Tony Hunter.

■■ The defendants' objections to both comments were sustained by the trial judge. While we agree that the prosecutor's comments were improper and exceeded legitimate inferences from the facts proved at trial, we do not think the comments were so prejudicial as to deny the defendants a fair trial. *People v. Bost* (1980), 80 Ill. App. 3d 933, 400 N.E.2d 734.

■■ The defendants next contend that the prosecutors attempted to slur their character by calling them gamblers and cheaters and "evil, deceitful men," accusing them of concocting their testimony while incarcerated and warning the jury not to be "set up" by the defendants as the alleged victims had been. Calling the defendants "evil, deceitful men," accusing them of concocting their testimony, and warning the jury against being set up were prosecutorial comments that exceeded the bounds of proper debate (*People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363), since these comments were unsupported by the evidence or reasonable inferences drawn therefrom. *Bost.*

With respect to the characterization of the defendants as gamblers, we note that the defendants testified that they had gone to Shephard's apartment to shoot dice. Hawkins specifically stated and it could be inferred from Watts' testimony that they had gone to the apartment to gamble. Furthermore, both defendants admitted that they were cheating on the night of January 10, 1977. Therefore, it was not improper for the prosecutor to refer to the defendants as gamblers and cheaters since the evidence presented at trial during defendants' case-in-chief supported this conclusion (*People v. Miller* (1958), 13 Ill. 2d 84, 148 N.E.2d 455, *cert. denied* (1958), 357 U.S. 943, 2 L. Ed. 2d 1556, 78 S. Ct. 1394; *People v. Eagle* (1979), 76 Ill. App. 3d 427, 395 N.E.2d 155; *People v. Owens* (1977), 46 Ill. App. 3d 978, 361 N.E.2d 644), and because it concerned the credibility of the witnesses (*People v. Franklin* (1976), 42 Ill. App. 3d 408, 355 N.E.2d 634).

The defendants also contend that the prosecutor improperly expressed a personal opinion concerning the defendants' guilt and the credibility of the defendants' defense. It is improper for a prosecutor to express his own opinion of the defendants' guilt. (*People v. Monroe* (1977), 66 Ill. 2d 317, 362 N.E.2d 295; *People v. Bitakis* (1972), 8 Ill. App. 3d 103, 289 N.E.2d 256.) Thus, the prosecutor committed error, and the court properly sustained the defendants' objections in this regard.

■■ Reviewing the improper prosecutorial comments discussed above, we cannot say that the impropriety reached such a level so as to deprive the defendants of their right to a fair trial. (*People v. Parker* (1979), 72 Ill. App. 3d 679, 391 N.E.2d 89.) Furthermore, the fact that the defendants did not argue on appeal that they were not proven guilty beyond a reasonable doubt adds credence to the position that the prosecutor's closing argument did not influence the jury decision. (*People v. Franklin.*) Since we do not

believe the improper statements contributed to or played a material factor in the defendants' convictions, reversal is not warranted. *People v. Fields* (1974), 59 Ill. 2d 516, 322 N.E.2d 33, *cert. denied* (1975), 423 U.S. 843, 46 L. Ed. 2d 65, 96 S. Ct. 80; *People v. Lopez* (1979), 70 Ill. App. 3d 213, 388 N.E.2d 466; *People v. Bigsby* (1977), 52 Ill. App. 3d 277, 367 N.E.2d 358.

### III.

As the third issue on appeal, defendants argue that the trial court erroneously denied Watts' pretrial motion to suppress a .45-caliber automatic weapon seized by the police when Watts was arrested. This weapon was introduced into evidence at trial and identified as the pistol from which the shot hitting Price was fired. At the time of the seizure, the police had neither a search warrant nor arrest warrant. The State maintains that the seizure was proper since the weapon was the product of a search incident to a lawful arrest.

Defendant Watts' pretrial motion to suppress the .45-caliber weapon was denied after the trial court conducted a hearing on the matter. At the hearing, the defendant called the three Chicago police officers who arrested him at his apartment on January 11, 1977. The corroborating testimony of these officers was that Joyce Bradford accompanied them to Watts' apartment for the arrest. She told them that Watts had a gun. When the officers arrived to arrest Watts, Watts was clad in his underwear. He asked the officers whether he could get dressed and when asked where his clothes were, pointed to an area near a dresser. One of the officers, John Nee, went to the dresser and saw bullets on top. He then opened the front righthand drawer and recovered the gun which was "on top of some papers." On the basis of this testimony, the court found Watts was properly arrested without a warrant and that the search of the dresser was reasonable because the ammunition was lying in plain view on top of the dresser.

The scope of a warrantless search made pursuant to a lawful arrest is the defendant's person and the "area from within which [the arrestee] might gain possession of a weapon or destructible evidence." (*Chimel v. California* (1969), 395 U.S. 752, 763, 23 L. Ed. 2d 685, 694, 89 S. Ct. 2034, 2040; accord, *People v. Williams* (1974), 57 Ill. 2d 239, 311 N.E.2d 681; *People v. Mancl* (1977), 55 Ill. App. 3d 41, 370 N.E.2d 664.) In *Mancl*, a situation similar to the instant case occurred. The defendant asked to go to his top dresser drawer to get some socks. The arresting officer searched the drawer and confiscated certain currency which was later used as evidence to convict the defendant. The court affirmed the trial court's denial of the defendant's suppression motion and stated:

> "[A] police officer may allow an arrested person to change clothes or dress and, in doing so, may keep the defendant under constant surveillance. Any evidence in plain view or in the area over which

the defendant has control, and in which there may be a weapon or destructible evidence, the officer may seize." *Mancl*, at 44.

The defendants in the instant case concede that the ammunition was properly seized since it was in the plain view of the arresting officers. They argue that the search and subsequent discovery of the gun was unreasonable because Watts was not in control of the dresser at the time of the search since he was sitting on the floor in the center of the room with the police officers' service revolvers aimed at him.

■■ In determining the reasonableness of a search, one must look to the facts and circumstances existing at the time of the arrest. (*Chimel*; *Williams*.) As the State points out in its brief, the factors relevant at the time of the seizure were the officers' knowledge that the defendant had a gun, the limitation of the search to the area of the room where the defendant indicated his clothes were, and the fact that ammunition was lying in plain view, further indicating the possible presence of a gun. Although one of the officers had his gun drawn on the defendant at all times, the defendant was not handcuffed and was going to be allowed to go into the area searched. Considering the totality of circumstances, we conclude the search incident to the lawful arrest was reasonable; and, therefore, the trial court's denial of the motion to suppress the .45-caliber revolver was not manifestly erroneous.

## IV.

As their final argument, the defendants contend that the trial court erred in allowing testimony for the purpose of qualifying Ray Price, one of the alleged victims, as a firearms expert based on his military service. The defendants first contend that Ray Price did not have sufficient skill, education or training to qualify as a firearms expert and, second, that the testimony regarding this issue was erroneously presented to the jury since opinion evidence was not presented during direct examination by the State.

At trial and in the presence of the jury, Ray Price testified that he was honorably discharged from the army after three years of service. He stated he received basic training and advanced infantry training. He testified he was trained in the use of a .45-caliber automatic, M-16 rifle, M-14 rifle, M-60 machine gun and M-50 machine gun. He stated the small arms training lasted every day for two weeks, three hours per day. Upon being questioned regarding the incidents occurring on January 10, 1977, Price testified that as he entered Alonzo Shephard's apartment, Watts held a .45-caliber gun and Hawkins held what looked like a .22-caliber gun. He was ordered by Watts to lie on the bed, and Watts went through his pockets while Hawkins tied his hands behind his back. Price stated he glanced to the left and saw Joyce Bradford standing in the corner behind a door. He

then turned his head back the other way, heard a door open, glanced to his right and saw the .45-caliber gun "coming down" upon him. Price testified he turned his head, closed his eyes and heard a gunshot and felt his leg jump up off the bed. He said he then heard another shot which he thought went off in the hall, and waited a few minutes before trying to get up. Price testified that the .45-caliber weapon, which had been marked previously for identification, was the gun he saw Watts holding on January 10, 1977. He identified the gun as a .45 automatic and said he had handled that type of weapon while in the service.

The prosecutors indicated during a sidebar that they wanted to qualify Ray Price as an expert witness for the purpose of showing that he could determine, on the basis of the sound he heard in Shephard's apartment, that he was shot by a .45-caliber gun. The bullet that went through Price's leg was never recovered. The trial judge indicated that while he did not feel Price was a firearms expert, he would allow testimony that Price served in the armed services, had small arms training and could distinguish between the noises from a .45- and a .22-caliber weapon.

It is well established that the determination of whether a witness is qualified to testify as an expert and whether testimony proffered is expertise in nature rests with the trial judge. (*People v. Park* (1978), 72 Ill.2d 203, 380 N.E.2d 795; *People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208; *People v. McKinnie* (1974), 18 Ill. App. 3d 1012, 310 N.E.2d 507; *People v. Stapelton* (1972), 4 Ill. App. 3d 477, 281 N.E.2d 76.) This discretion will not be disturbed unless clearly and prejudicially erroneous. *People v. Aliwoli* (1976), 42 Ill. App. 3d 1014, 356 N.E.2d 891.

■■ The judge's determination that Ray Price did not have the qualifications to serve as a firearms expert was not erroneous. Furthermore, since the prosecution failed to ask Price his opinion of the caliber of the weapon from which he thought the bullet causing his injury originated, Price did not improperly testify as an expert. The defendants contend, however, that they were prejudiced by the testimony regarding Price's military background. We disagree. Price's testimony in this regard was admissible to show his knowledge of firearms and his ability to identify the .45-caliber weapon presented at trial. While the extensive questioning of Price relative to his military experience was unnecessary, since he was never asked to identify the weapon used to shoot him based on its retort, we hold the defendants were not prejudiced thereby.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNAMARA and SIMON, JJ., concur.