# Illinois Official Reports

## Appellate Court

---

**People v. Lewis, 2015 IL App (1st) 122411**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDRE LEWIS, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-2411 |
| Filed<br>Rehearing denied | February 27, 2015<br>April 2, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first degree murder was upheld over his contentions that the trial court failed to give a jury instruction on self-defense on the ground that no defense witnesses testified that defendant shot the victim, that the trial court erred in allowing the State to present evidence and closing argument that defendant was hiding from the police and that the trial court applied the wrong legal standard in evaluating defendant's claims of ineffective assistance of counsel, since defendant did not raise the issue of self-defense in his trial and with respect to the claims of ineffective assistance of counsel, defendant had an opportunity to present each of the issues raised in his *pro se* motion during a *Krankel* inquiry and the trial court found no ineffective assistance of counsel and defendant failed to show this finding was manifestly erroneous. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-28303; the Hon. Steven J. Goebel, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Michael J. Pelletier, Alan D. Goldberg, and S. Emily Hartman, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Kathleen Warnick, and Yvette Loizon, Assistant State's Attorneys, of counsel), for the People.

Panel
JUSTICE REYES delivered the judgment of the court, with opinion. Presiding Justice Palmer and Justice McBride concurred in the judgment and opinion.

## OPINION

¶ 1    Following a jury trial in the circuit court of Cook County, defendant Andre Lewis was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2006)) and was sentenced to 60 years in prison. On appeal, defendant contends the trial court erred in: (1) refusing a jury instruction on self-defense on the ground that no defense witnesses testified that defendant shot the victim; (2) allowing the State to introduce evidence and present closing argument that defendant was hiding from the police; and (3) applying the wrong legal standard in assessing posttrial claims of ineffective assistance of counsel. For the following reasons, we affirm the judgment of the circuit court.

¶ 2                              BACKGROUND
¶ 3                         Pretrial Proceedings
¶ 4    On December 19, 2006, defendant was charged by indictment with first degree murder, arising out of the May 14, 2006, shooting death of Darryl Simms.[1] On April 5, 2007, the State filed a motion for pretrial discovery, requesting in part written notice of any defense, affirmative or nonaffirmative, which defendant intended to assert at any hearing or at trial. On May 28, 2009, defendant filed an answer to the State's motion for pretrial discovery, in which defendant denied each and every allegation of the charges and stated he would rely on the State's inability to prove him guilty beyond a reasonable doubt. The answer does not indicate that defendant intended to raise any affirmative defense to the charges against him. On December 2, 2009, private defense counsel moved to withdraw from representing defendant, citing an irreconcilable conflict regarding trial strategy. On December 10, 2009, an assistant public defender entered her appearance on behalf of defendant.

---

[1]The indictment and other documents in the common law record refer to the victim in this case as "Darrell Sims." The trial transcript of proceedings refers to the victim as "Darryl Sims." The supplemental transcript of pretrial proceedings regarding jury selection refers to the victim as "Darryl Simms." The briefs filed in this appeal adopted the third spelling and we do so here.

¶ 5    On February 16, 2012, defendant, through two assistant public defenders,[2] filed a supplemental answer to the State's motion for pretrial discovery, in which defendant not only denied the charges, but also stated he "may or may not assert the defense of self-defense." On the same date, despite defendant being represented by counsel, the trial court also heard defendant's *pro se* "motion for ineffective assistance of counsel." During the hearing, defendant asserted he had been unable to have a conversation with the investigator working on his defense and did not know whether the investigator or counsel had interviewed the witnesses defendant sought to present at trial. One of the public defenders representing defendant informed the trial court she had spoken to witnesses identified by defendant, although the public defender's office was attempting to locate one of the witnesses who had since moved. In addition, there were two witnesses the public defender's office had been unable to locate. A second public defender denied that defendant was unable to converse with counsel or the defense investigator, noting that she, her colleague, and the defense investigator visited defendant at the correctional facility on February 15, 2012, but defendant refused to speak to them. Defendant responded that the meeting with the investigator was untimely because he had requested to speak with the investigator for over one year. The trial court observed that defendant raised similar complaints of insufficient investigation against his prior, private representation when his case was previously set for trial. The trial court did not expressly deny the motion, but observed that the prior and current defense counsel were very good attorneys, instructed defendant to consult with counsel and continued the case by agreement to February 21, 2012.

¶ 6                                    Trial

¶ 7    The trial in this case ultimately commenced on March 20, 2012. Defendant remained represented by the aforementioned two public defenders.

¶ 8    Michael Bush (Bush) testified he considered Simms his brother, because Simms had been with his sister for 12 years. On May 14, 2006, Bush and Simms, while shopping for Mother's Day gifts, visited a strip mall at 3900 West Madison Street. Vendors sold a variety of goods in the mall parking lot. During the past seven years, Bush also sold goods at this location.

¶ 9    Bush testified that a young man then approached him in the parking lot and inquired whether Bush was selling shoes. Bush replied that he was not selling shoes, but informed him Simms had some shoes in the trunk of his automobile. The young man purchased some shoes from Simms. According to Bush, during the sale another automobile stopped next to Simms and the individuals in the vehicle also purchased some shoes from Simms.

¶ 10   Bush also testified that when he and Simms first arrived at the parking lot, he had noticed a man he knew as "Renegade" conducting business at the same location. Bush identified defendant in court as "Renegade." Bush further testified that defendant drove a maroon Chevrolet Lumina, which was parked in the mall lot, with the front end of the automobile facing in a direction to drive straight out from the lot.

¶ 11   After Simms had sold several pairs of shoes, Bush heard defendant telling Simms he should not be selling shoes. Defendant was standing near his Lumina during this conversation. Bush, who was approximately 10 feet away from Simms, testified he turned

---

[2]The record on appeal does not contain a filed appearance from the second assistant public defender.

toward defendant and said, "[G]o on with that man. Ain't nobody here for that. This is Mother's Day." Defendant acknowledged Bush's comment and walked away westward, in the direction of the Lumina. According to Bush, Simms never approached defendant and did not lift his shirt to display a handgun because Simms was not armed with a weapon.

¶ 12    After the conversation between defendant and Simms, Bush testified that he and a young man were walking westward in the parking lot when Simms passed them, conversing on his cell phone. Bush did not observe a truck pull up near Simms and did not see him remove a weapon from the truck at that time. Bush, however, did observe defendant close the door of the Lumina and approach Simms, who was "coming out of his coat." Bush thought Simms may have wanted to fight. Bush testified that he grabbed Simms and said, "[M]an, this ain't no nothing."

¶ 13    According to Bush, he observed defendant "come out of his pocket and start shooting" Simms with a small, black revolver. Defendant was approximately five feet away from Simms. Defendant fired his weapon three or four times and did not fire at Bush. Simms attempted to run away from defendant, but fell over. According to Bush, defendant then jumped into his Lumina and sped eastward out of the parking lot.

¶ 14    Bush testified that he went up to Simms, whose eyes were rolling backward in his head. Bush reached into Simms' pocket to remove his keys with the intent to use his automobile, but a man said, "[N]o, don't go. That's your brother. They're going to take his stuff." Bush remained at the scene of the shooting and spoke to the police and paramedics who later arrived at the scene. On May 15, 2006, Bush had further conversations with the police and identified a photograph of defendant as the man who shot Simms. On May 17, 2006, Bush went to the Area 4 police headquarters and again identified defendant from a photographic array as the shooter. On November 16, 2006, Bush also identified defendant in a lineup at Area 4 police headquarters as the individual who shot Simms.

¶ 15    Clarence Barnes (Barnes) testified he was at the strip mall in question at approximately 1 p.m. on May 14, 2006. Barnes went to the mall with two female friends, who purchased shoes from Simms.[3] Defendant asked Barnes whether he purchased shoes from Simms and, if so, the cost and size of the shoes. Barnes responded that he had purchased shoes and inquired whether defendant was also selling shoes because he and his friends wanted to purchase additional pairs of shoes. Defendant replied, "[D]on't worry about it" and walked away. According to Barnes, defendant had "hostility in his voice about the situation."

¶ 16    Barnes decided to leave the lot, due to a fear of theft. As Barnes returned to his truck, he noticed Simms and defendant were arguing. While Barnes engaged in a conversation with someone else, he heard gunfire. Barnes ducked and could not observe who was firing. Barnes had not observed either Simms or defendant with a handgun. Barnes, however, saw Simms lying on the ground, with Bush standing over him. Barnes testified he did not see Bush searching Simms' pockets. On May 19, 2006, Barnes went to the Area 4 police headquarters and identified a photograph of defendant from an array of photographs as the individual standing over Simms.

¶ 17    Tawanda Evans (Evans) testified that in May 2006, she lived on the eighteenth floor of an apartment building right behind the strip mall and had an unobstructed view of the parking lot. At approximately 1:30 p.m. on May 14, 2006, she was in her apartment, viewing the

_____

[3]Barnes later realized Simms' brother Henry was married to Barnes's aunt.

- 4 -

parking lot from her window while speaking with her daughter on her cell phone. Evans observed Simms and a man she could not identify in a conversation. Evans then watched as Simms turned around and the other man walked toward Simms, raised his hand and shot Simms. Evans heard three gunshots and observed Simms fall to the ground. According to Evans, the shooter drove "some sort of red" vehicle around Simms to exit the parking lot. Evans did not see Simms with a handgun. Evans also testified there were no other people standing in the area when the shooting occurred, but after the shooting a man jumped a fence and commenced searching Simms' pockets. Evans telephoned 911 to report the shooting, but she was unable to identify the shooter to the police.

¶ 18    James Rogers (Rogers), who was working as a security guard at a store in the strip mall that day,[4] testified he heard several gunshots and ran out of the store, proceeding down an aisle of the parking lot. Rogers observed "a hand sticking out with a weapon in it, but just the hand." According to Rogers, he could not exactly identify the weapon, "[b]ut it looked like it could be a revolver." Rogers described the weapon as "dark in color, possibly blue steel or black." He also observed a man fall backwards and this individual was not holding a handgun. The person with the weapon was wearing a black hood, but Rogers could not observe the shooter's face because his view was obstructed by the vehicles in the parking lot. Rogers further observed the shooter drive past Simms in a maroon or burgundy Lumina or a vehicle of a similar model which had been parked on the west end of the parking lot. Another man ran up to the body, screaming, "I can't believe he shot my brother." Rogers did not observe a handgun in the possession of this individual. Rogers testified the man commenced searching the victim's pockets. Rogers advised the same individual not to move and to stay there with the body while Rogers telephoned the police.

¶ 19    Chicago police officer Warnecke[5] testified she was a few blocks away from the strip mall when she received a radio call of a "man shot" shortly after 1:30 p.m. on May 14, 2006. Officer Warnecke arrived at the scene within a few minutes. According to Officer Warnecke, Bush was distraught and crying. Officer Warnecke searched both Simms and Bush and found no weapons. The officer then secured the scene. Bush identified defendant as "Renegade" to Officer Warnecke, who was unable to locate defendant in the parking lot.

¶ 20    Chicago police officer Gary Powell testified that in May 2006, he worked a foot patrol, which included the strip mall at 3900 West Madison Street. Officer Powell was familiar with defendant because he knew defendant sold shoes in the parking lot at least three or four times per week. After the shooting, however, Officer Powell never saw defendant return to the parking lot again.

¶ 21    Chicago police detective Adrian Garcia testified he was assigned to investigate the shooting in May 2006. Detective Garcia testified he prepared the photographic array, showed the photograph, and arranged the lineup in which Bush identified defendant as the shooter.

¶ 22    Chicago police sergeant Peter Devine responded to a homicide assignment at 3900 West Madison Street at approximately 1:35 p.m. on May 14, 2006. Sergeant Devine received information regarding the suspect and his vehicle. Sergeant Devine commenced a search for defendant and a red Chevy Lumina by proceeding to an address in Forest Park, but neither

---

[4]Rogers also worked as a parole officer for the Illinois Department of Corrections.

[5]Officer Warnecke's first name does not appear in the record on appeal. The State's answer to the defense motion for pretrial discovery, however, indicates Officer Warnecke's first initial is "V."

defendant nor his wife, Sharina Clark Lewis (Sharina), was there. Sergeant Devine also issued an investigative alert indicating defendant was wanted for an interview, as well as a "leads message" regarding defendant and the vehicle. Sergeant Devine further issued a daily bulletin notice for the temporary license plates affixed to the Lumina, which was registered in Sharina's name.[6]

¶ 23   Sergeant Devine subsequently visited Sharina's place of employment, Taft High School, provided Sharina with a business card, informed her that the police were looking for defendant regarding a shooting, and requested she contact the police if she had any contact with defendant. Over defense objections, Sergeant Devine testified he had similar contact with several friends and relatives of defendant, including his stepfather, stepbrother, and sister-in-law and the mother of defendant's daughter. Sergeant Devine continued to search for defendant, particularly in the Forest Park area, but did not receive any information regarding defendant through these individuals. In August 2006, however, Sergeant Devine learned that permanent Illinois license plates were issued for the Lumina.

¶ 24   Chicago police sergeant Keane[7] testified that on October 19, 2006, he recovered the Chevrolet Lumina. According to Sergeant Keane, the vehicle was black instead of maroon when it was recovered.

¶ 25   The parties stipulated that if called as a witness, Cook County assistant medical examiner Valarie Arangelovich would testify that Simms died of multiple gunshot wounds and the manner of death was homicide.

¶ 26   Chicago police officer Vernon Mitchell testified that on November 15, 2006, he was assisting other police officers in locating defendant. Officer Mitchell usually worked in the organized crime unit of the Chicago police department, which also conducted surveillance for other units. Officer Mitchell, working with seven other officers and a sergeant, proceeded to Taft High School. Officer Mitchell had been provided a photograph of defendant and a description of Sharina's automobile, a white Dodge Intrepid.

¶ 27   Officer Mitchell testified Sharina got into the Intrepid and headed eastward into the city on the Kennedy Expressway. The police followed in seven vehicles, one of which was an unmarked police vehicle and the remainder of which were "covert" regular automobiles. According to Officer Mitchell, Sharina engaged in evasive driving, speeding up, slowing down, and going from lane to lane. The police followed the Intrepid to the Dan Ryan Expressway and lost track of the vehicle on the expressway at approximately 71st Street.

¶ 28   On November 16, 2006, Officer Mitchell and his team again conducted surveillance of the Intrepid. At Taft High School, Officer Mitchell walked past the vehicle and observed clothes and luggage in the rear seat. Subsequently, Sharina got into the Intrepid and again engaged in evasive driving on the Kennedy and Dan Ryan Expressways, exiting the Dan Ryan at 79th Street. Sharina stopped at a motel located at 79th Street and Cottage Grove Avenue and entered one of the motel rooms. According to Officer Mitchell, during the next four hours, Sharina was observed carrying luggage to her vehicle from the motel room. Sharina and an African-American male then left the motel, with the male driving the Intrepid.

_____

[6]Forest Park police sergeant Michael Keating testified that in April 2006, after issuing a ticket for an unattended 1996 maroon Lumina, he learned Sharina owned the vehicle. Sergeant Keating also testified the keys to the Lumina were retrieved at the police station by defendant.

[7]Sergeant Keane's first name does not appear in the transcript of proceedings.

Officer Mitchell and his team followed the Intrepid and while stopped at a traffic light pulled alongside of the vehicle. Officer Mitchell testified he identified defendant as the driver of the Intrepid and defendant was arrested shortly thereafter. During the arrest, defendant was searched and an identification card issued by the state of New Jersey was recovered, bearing defendant's photograph with the name Sean Robertson.

¶ 29    Following Officer Mitchell's testimony, the State rested.

¶ 30    The defense called Assistant State's Attorney (ASA) Nancy Galassini, who testified that on June 1, 2006, she obtained a handwritten statement from Bush. In the statement, Bush indicated that on the day of the shooting, he observed his friend James driving a truck and called for him to come over and James walked over to them.

¶ 31    Maurice Wilson (Wilson) testified he had been convicted of aggravated battery in 2004 and defendant was his uncle. Wilson also testified he and three other family members were assisting defendant in selling shoes prior to the shooting. Wilson was promoting the shoes to people entering the parking lot.

¶ 32    Wilson observed an "altercation" between defendant and Simms, describing Simms as very loud and aggressive. Wilson heard defendant say, "I ain't on that. Go on. I'm trying to make some money here like everyone else." According to Wilson, Simms walked away and defendant resumed selling shoes. Wilson testified defendant did not have or display a handgun at that time.

¶ 33    Shortly thereafter, Wilson observed a gray van enter the parking lot and drive toward Simms. Wilson also testified Simms reached into the vehicle, said something to the driver, then removed a handgun from the vehicle, which Simms placed in his waistband. Wilson found defendant and informed him that Simms had a weapon. Defendant gathered his crew together to share the information, then resumed selling shoes.

¶ 34    Wilson further testified he observed Simms again approach defendant and become aggressive. According to Wilson, Simms said, "So you ain't gonna leave?" and lifted his shirt to reveal the handgun. Wilson testified that Simms placed his hand on the weapon, but did not remove or aim it.

¶ 35    Wilson additionally testified that at this juncture, a man named Rico ran by and shot Simms. During the shooting, Wilson ducked behind an automobile. Wilson testified he observed Rico run across the parking lot and through the pedestrian exit. After the shooting, Wilson observed a dark-skinned man bend down and remove the handgun from Simms' waist along with a gold chain and something from Simms' wrist. Wilson testified he never returned to the parking lot after that day, due to fear and the desire to avoid a similar situation. Wilson did not telephone the police about the shooting, even after defendant was arrested, explaining he did not trust the police.

¶ 36    Tommie Lewis (Tommie) testified that defendant is his uncle. Tommie assisted defendant in selling shoes in the parking lot before the shooting. Tommie's testimony was substantially similar to Wilson's testimony, indicating that, after an initial dispute, he observed Simms approach defendant, lifting his shirt to display what appeared to be a handgun, when Rico ran by, holding a weapon. Tommie, however, did not observe the shooting, having moved between two automobiles and ducked down out of fear. Tommie also did not observe Simms with a handgun until Simms lifted his shirt. In addition, Tommie left the parking lot quickly and did not see Simms or others after the shooting.

¶ 37    The parties stipulated that if called as a witness, Chicago police detective Gallagher would testify that on May 14, 2006, while investigating the shooting, Bush informed him an unknown African-American male displayed a dark, semiautomatic handgun when they inquired whether the man had shoes for sale. Bush did not inform Detective Gallagher that he or Simms ever sold shoes in the parking lot.

¶ 38    The parties also stipulated that if called as a witness, certified court reporter Donna J. O'Connor would testify she transcribed grand jury proceedings in which Bush testified a man approached him about purchasing shoes, but instead purchased shoes from Simms. Bush also testified to the grand jury that defendant approached Simms after the sale.

¶ 39    The parties further stipulated that if called as a witness, used automobile dealer Hector Vila would testify he sold a maroon Chevrolet Lumina to Sharina in March 2005, and defendant and Sharina obtained the license plates for the vehicle in July or August of 2006. Vila would also testify Chicago police contacted him on August 22, 2006, and requested Vila contact the police if defendant returned to the dealership. Vila would further testify that defendant came to the dealership on August 26, 2006, to have one of the windows on the Lumina repaired.

¶ 40    The parties additionally stipulated that if called as a witness, defense investigator Steven Ramsey would testify Tommie had informed him that after a few hours in the parking lot he noticed a Dodge Charger pull into the lot and observed shoes being sold from the trunk of that vehicle. Ramsey would also testify Tommie stated he heard defendant ask Simms to respect his space and his sales, at which point Simms said something and walked away. Ramsey would further testify he interviewed Wilson, who never informed Ramsey that Rico shot Simms.

¶ 41                                    Jury Instructions

¶ 42    During the jury instruction conference,[8] defense counsel sought an instruction on self-defense.[9] The State objected to the instruction, arguing the theory of the defense case was that Rico, not defendant, shot Simms. The trial judge denied the instruction, reasoning there had been no testimony, "obviously other than the State's witnesses," that defendant shot Simms, and the defense witnesses testified defendant did not shoot Simms. The trial judge also denied jury instructions regarding the lawful justification of the use of force.[10]

¶ 43                                          Verdict

¶ 44    Following closing arguments and jury instructions, the jury deliberated and returned a verdict finding defendant guilty of the charge of first degree murder. The jury additionally found defendant personally discharged the firearm proximately causing the death of Simms.

---

[8]In his brief, defendant asserts the conference occurred after the parties rested their cases. The transcript of proceedings indicates the conference occurred prior to the final series of stipulations.

[9]The transcript of proceedings indicates defense counsel offered the version of the pattern instruction including the phrase "without lawful justification." See Illinois Pattern Jury Instructions, Criminal, No. 7.01 (4th ed. 2000) (hereinafter, IPI Criminal 4th).

[10]These instructions included IPI Criminal 4th Nos. 7.02 and 24-25.06.

Posttrial Motions

¶ 46 On May 24, 2012, defendant informed the trial court he was "dismissing" his trial counsel and requested transcripts and leave to file a *pro se* motion for a new trial, asserting his counsel was ineffective during his trial. The trial court continued the matter in order for defendant to fully consider his decision. On May 31, 2012, defendant renewed his request to proceed *pro se*. The trial court inquired whether defendant understood the court could consider the claim of ineffective assistance of trial counsel pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), while retaining representation for the posttrial motion. Defendant adhered to his request to represent himself and the trial court granted that request.

¶ 47 On June 4, 2012, defendant filed his *pro se* motion for a new trial, alleging ineffective assistance of trial counsel. In his motion, defendant asserted his defense team failed to: (1) question Officer Powell regarding whether anyone was allowed to sell goods in the mall parking lot after the shooting; (2) challenge Officer Mitchell's testimony that Sharina had engaged in evasive driving; (3) question Rogers' employer before the trial or question Rogers during trial about items Bush may have taken from Simms after the shooting; (4) question whether Evans wears eyeglasses; (5) explain that a photograph of him in a black, hooded sweatshirt was taken years before the shooting; (6) call Clinton Loggins and Richard Baines as witnesses; (7) question Tommie about an alleged assault by Officer Powell in the days after the shooting, and the police allegedly confiscating Tommie's van approximately one month after the shooting; (8) verify that defendant attempted to contact Detective Gallagher in September or October 2006; (9) call Vila as a defense witness; and (10) request to strike two venirepersons who were or had family members who were crime victims, but the offenders were never apprehended. Defendant also complained that defense counsel convinced him against testifying on his own behalf. Defendant further objected to defense counsel submitting a jury instruction on self-defense because he never indicated to counsel that he had shot Simms.

¶ 48 On June 11, 2012, defendant sought and was granted leave to amend his *pro se* motion for a new trial, but no amended *pro se* motion appears in the record on appeal. On June 18 and 25, 2012, defendant sought extensions of time to amend his *pro se* motion, based on the difficulty of accessing the prison law library. The trial court denied the extensions, but again offered defendant a hearing pursuant to *Krankel*, which defendant ultimately accepted.

¶ 49 On July 30, 2012, the trial court heard the points raised in the *pro se* motion for a new trial, allowing defense counsel an opportunity to respond after each point. In general, defense counsel asserted their decisions were based upon trial strategy. At the conclusion of the hearing, the State also argued defendant had received effective assistance of counsel throughout the proceedings. The trial court then denied the *pro se* motion for a new trial, finding it had observed the trial attorneys and found no ineffectiveness on their part. Defendant thereafter decided to proceed with his appointed counsel.

¶ 50 On July 30, defense counsel filed a posttrial motion for a new trial. Among the grounds asserted in this motion was the trial court's admission of evidence regarding the efforts by police to locate defendant. The motion asserted the State elicited the information to imply defendant fled or was in hiding, when there was no evidence as to whether defendant visited the individuals the police contacted. On August 1, 2012, the trial court denied the posttrial motion for a new trial and proceeded to a sentencing hearing. After hearing arguments in aggravation and mitigation of the offense, the trial court sentenced defendant to 60 years in

prison, of which 25 years was an enhancement based on the jury finding that defendant personally discharged the firearm causing the death. On August 3, 2012, defendant filed a motion to reconsider his sentence, which the trial court denied on the same day. Defendant also filed a timely notice of appeal to this court on August 3, 2012.

ANALYSIS

On appeal, defendant contends the trial court erred in: (1) refusing a jury instruction on self-defense on the ground that no defense witnesses testified that defendant shot Simms; (2) allowing the State to introduce evidence and present closing argument that defendant was hiding from the police; and (3) applied the wrong legal standard in assessing posttrial claims of ineffective assistance of counsel. We address these contentions in turn.

The Refusal of the Jury Instructions Regarding Self-Defense

Defendant first argues the trial court erred in refusing a jury instruction on self-defense on the ground no defense witnesses testified that defendant shot Simms. "[T]he first degree murder statute explicitly states that first degree murder occurs where a person kills another individual *without lawful justification*." (Emphasis in original.) *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995); see 720 ILCS 5/9-1(a) (West 2006). "One of the recognized justifications to first degree murder is the affirmative defense of self-defense." *Jeffries*, 164 Ill. 2d at 127. When a murder defendant asserts self-defense, the State must prove not only the elements of first degree murder, but also that the murder was not carried out in self-defense and that the defendant's use of force was not legally justified. *Id.*; *People v. Flemming*, 2014 IL App (1st) 111925, ¶ 52.

Nevertheless, a defense of justifiable use of force is an affirmative defense. 720 ILCS 5/7-14 (West 2006). Accordingly, "unless the State's evidence raises the issue involving the alleged defense, *the defendant bears the burden of presenting evidence sufficient to raise the issue*." (Emphasis added.) *People v. Everette*, 141 Ill. 2d 147, 157 (1990).

"A defendant in a criminal case is entitled to have the jury instructed on any legally recognized defense theory which has some foundation in the evidence, however tenuous." *People v. Looney*, 46 Ill. App. 3d 404, 410 (1977). "[A]n instruction should not be given without evidence to support it." *People v. Zertuche*, 5 Ill. App. 3d 303, 306 (1972). A criminal defendant is entitled to a jury instruction on self-defense if " 'very slight' " or "some" evidence exists to support the theory of self-defense. *Everette*, 141 Ill. 2d at 156, 157. "In order to instruct the jury on self-defense, the defendant must establish some evidence of *each* of the following elements: (1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable." (Emphasis added.) *Jeffries*, 164 Ill. 2d at 127-28. The decision whether to give a jury instruction is generally within the trial court's discretion and will not be reversed absent an abuse of that discretion. *People v. Jones*, 219 Ill. 2d 1, 31 (2006). The underlying decision regarding whether there is sufficient evidence in the record to warrant giving the jury a particular instruction, however, is a question of law and will be reviewed *de novo*. *People v. Washington*, 2012 IL 110283, ¶ 19.

¶ 57    The State argues a defendant is not entitled to a self-defense instruction when he denies acting in self-defense. The State relies on a line of decisions culminating in *People v. Salas*, 2011 IL App (1st) 091880.[11] The *Salas* court noted that this court has held: " '[r]aising the issue of self-defense requires as its sine qua non that defendant had admitted the killing.' " *Salas*, 2011 IL App (1st) 091880, ¶ 84 (quoting *People v. Lahori*, 13 Ill. App. 3d 572, 577 (1973)); see also *People v. Diaz*, 101 Ill. App. 3d 903, 915 (1981) (same). The court stated Salas "never admitted he killed [the victim] and, as such, never presented any evidence that he reasonably believed deadly force was necessary to prevent imminent death or great bodily harm to himself or another or the commission of a forcible felony." *Salas*, 2011 IL App (1st) 091880, ¶ 85. The court thus reasoned: "Defendant's claim that he did not shoot the gun and kill [the victim], and his concomitant failure to present any evidence that he believed deadly force was necessary to prevent imminent death or great bodily harm or a forcible felony, were inconsistent with, and cannot support the giving of, a self-defense instruction." *Id.* ¶ 87.

¶ 58    In so ruling, the *Salas* court merely followed long-standing Illinois case law. For example, in *Lahori*, the defendant was convicted of murder for the shooting death of the victim. On appeal, Lahori challenged the trial court's rejection of his proposed self-defense instruction, arguing the instruction was appropriate "based on his testimony that although he [did] not remember shooting the deceased, he [did] remember her hitting, scratching, and biting him, and that if he did shoot her, he would have been acting in self-defense." *Lahori*, 13 Ill. App. 3d at 577. This court held that the defendant's denial that he knowingly killed the victim was "inconsistent with a proper claim of self-defense." *Id.* at 578.

¶ 59    In *People v. Hawkins*, 88 Ill. App. 3d 178 (1980), the defendants were convicted of aggravated battery. On appeal, the defendants argued the trial court erred in refusing their request for a self-defense jury instruction. This court noted "[t]he defense of self-defense presupposes that the accused committed the act and invokes the defense as a justification." *Id.* at 182 (citing *People v. Smith*, 254 Ill. 167 (1912)). At trial, both defendants denied shooting the victims. See *Hawkins*, 88 Ill. App. 3d at 182. Accordingly, the appellate court concluded it was not error for the trial court to refuse the defendants' tendered instruction. *Id.*

¶ 60    In *Diaz*, the defendants were convicted of aggravated battery arising out of a quarrel with the victims. At trial, the defendants and the victims disagreed over who initiated the quarrel. On appeal, the defendants contended the trial court improperly refused to instruct the jury on the justifiable use of force. *Diaz*, 101 Ill. App. 3d at 914. The appellate court disagreed that the justified use of force was an available theory because the "[d]efendants and their witnesses consistently asserted that none of the victims had been struck." *Id.* The first codefendant "testified that after being called a name, he threw a mop at the complainants which did not hit them" and the second codefendant "asserted that he grabbed someone, but he did not testify that he used any force against the complaining witnesses." *Id.* at 915. Accordingly, "[s]ince defendants denied committing the acts, and the State's evidence did not show that defendants' use of force was justified, the trial court properly refused the

_____

[11]In *Salas*, the issue before the court was whether, having given the jury an instruction on self-defense, the trial court abused its discretion by failing to also instruct the jury on second degree murder. *Id.* ¶ 82. The *Salas* court considered whether the evidence supported the giving of the self-defense instruction because, in the absence of such evidence, the defendant was not entitled to an instruction on second degree murder. *Id.* ¶ 83.

instruction." *Id*.; see also *People v. Chatman*, 381 Ill. App. 3d 890, 898 (2008) ("[n]o instruction on self-defense \*\*\* is applicable to an act that a defendant denies committing"); *People v. Kasp*, 352 Ill. App. 3d 180, 194 (2004) (self-defense instruction not warranted where it is clear from the record that defendant in no way attempted to raise a claim of self-defense at any point throughout his trial).[12]

¶ 61 Defendant relies upon Illinois Supreme Court decisions holding a defendant is entitled to any defense the evidence supports, even when a defense is inconsistent with the defendant's testimony. See, *e.g.*, *People v. Bratcher*, 63 Ill. 2d 534, 539 (1976); *People v. Izzo*, 14 Ill. 2d 203, 211 (1958); *People v. Papas*, 381 Ill. 90, 95 (1942); *People v. Scalisi*, 324 Ill. 131, 145 (1926). For example, in *Everette*, our supreme court held "a homicide defendant is entitled to an instruction on self-defense where there is some evidence in the record which, if believed by a jury, would support the defense, even where the defendant testifies he accidentally killed the victim." *Everette*, 141 Ill. 2d at 156-57. Thus, defendant contends he was entitled to a self-defense instruction based on the evidence presented at his trial.

¶ 62 In *Everette*, however, the defendant testified that he accidentally killed the victim. *Id*. at 150. "Not once, but repeatedly, [Everette] testified that the shooting was an accident, adding at one point that he pulled the gun out of the waistband of his pants and pointed it at the victim 'just to scare him.' " *Id*. at 162. In *Bratcher*, the defendant testified he struck a police officer in surprise and anger. *Bratcher*, 63 Ill. 2d at 538.[13] In *Izzo*, the defendant did not challenge the sufficiency of the evidence to sustain the verdict. *Izzo*, 14 Ill. 2d at 210. In *Papas*, the defendant testified he fired two shots from his weapon into the air; although he claimed he did not see the victim, the bullet which killed her was fired from defendant's weapon and there was no question raised as to whether defendant fired the fatal shot. See *Papas*, 381 Ill. at 93. In *Scalisi*, the defendant testified to firing a shotgun at one of the victims. See *Scalisi*, 324 Ill. at 140-41. *Everette*, *Bratcher*, *Izzo*, *Papas*, and *Scalisi* are thus distinguishable from this case, as there was no question regarding the defendants' use of force in each of those prior decisions. In this case, defendant did not testify and the defense witnesses did not testify that defendant used any force in the shooting incident.

¶ 63 Indeed, the pretrial answer defendant filed in this case did not indicate that defendant intended to raise the affirmative defense of self-defense. In his supplemental answer to the State's motion for pretrial discovery, defendant not only denied the charges, but also stated he "may or may not assert the defense of self-defense." At trial, the State's evidence did not raise the issue of self-defense. Defendant and Simms quarreled before the shooting, but "the use of foul or abusive language is no reason for taking another's life." *People v. Felella*, 131 Ill. 2d 525, 534 (1989) (citing *People v. Marrow*, 403 Ill. 69, 75 (1949)); see also *People v. McGee*, 110 Ill. App. 3d 766, 771-72 (1982) (quarrel plus display of a carpenter's knife). Indeed, "[t]he long-standing rule is that mere threats of personal injury or death do not justify taking the life of the person making the threats when he is doing nothing to put them into execution." *Felella*, 131 Ill. 2d at 534 (citing *People v. Golson*, 392 Ill. 252, 255-56 (1945)).

---

[12]Indeed, in *Chatman*, this court determined it was error for the trial court to submit a self-defense instruction on acts to which defendant never admitted. *Chatman*, 381 Ill. App. 3d at 900.

[13]*Bratcher* and similar cases involved evidence that precluded any possibility of using self-defense as an affirmative defense. See *People v. Stewart*, 143 Ill. App. 3d 933, 936 (1986) (and cases cited therein).

¶ 64    Defendant did not testify on his own behalf and thus never admitted firing his weapon at Simms. Moreover, the defense witnesses did not testify that defendant used justifiable force against Simms. Rather, the defense witnesses testified that Simms approached defendant and lifted his shirt, revealing a handgun. Wilson also testified Simms placed his hand on the weapon in his waistband, but never removed the handgun. The defense witnesses, however, testified that a third party named Rico actually fired the shots that killed Simms. The record thus establishes that defendant did not raise the issue of self-defense at his trial and the State was not obliged to disprove this affirmative defense. See *Jeffries*, 164 Ill. 2d at 127.

¶ 65    Furthermore, even if cases such as *Everette* and *Bratcher* were not distinguishable from this case, the trial judge's reasoning was consistent with the well-established rule that a "defendant may not combine the State's evidence of the defendant's act with his own testimony that he was in fear of his safety to raise the issue of self-defense." *People v. Freeman*, 149 Ill. App. 3d 278, 281 (1986) (and cases cited therein); see also *People v. Sanchez*, 2014 IL App (1st) 120514, ¶¶ 29-31 (explaining why counsel was not ineffective in failing to request a self-defense instruction in case where the prosecution evidence established the defendant's use of force, but the defense witnesses denied the defendant used force). The *Freeman* court relied in part on *People v. Dukes*, 19 Ill. 2d 532 (1960). In *Dukes*, the defendant was convicted of the first degree murder of Chicago police officer John Blyth. *Id.* at 533. On appeal, Dukes argued that the trial court erred in refusing to instruct the jury he could be justified in shooting at a person who was pursuing and shooting at him, if the jury found the defendant was threatened by the actions of Chicago police officer Daniel Rolewicz, who had been patrolling with Officer Blyth. See *id.* at 534, 539. Our supreme court summarized the evidence as follows:

> "Officer Rolewicz testified that he shouted at the defendant and advised him that he was a police officer and that defendant, without reply, drew his gun and shot at him. In defendant's own testimony he testified that he did not hear Rolewicz say that he was a police officer and that when he saw Rolewicz draw his gun he started to draw his. He testified that he was trying to scare Rolewicz so that he could get away. Defendant also denied firing any shot from the alley." *Id.* at 539-40.

The *Dukes* court concluded "[t]his testimony was insufficient to require an instruction on self-defense." *Id.* at 540.

¶ 66    In this case, defense counsel's request for a self-defense instruction was based on an attempt to combine the State's evidence that defendant shot Simms with defense evidence from which the defense sought to infer that defendant feared for his safety, although no direct evidence was introduced by either side that defendant was in fear for his life or had a reasonable apprehension of a confrontation. The trial judge refused the self-defense instructions based on insufficient evidence, reasoning there had been no testimony, "obviously other than the State's witnesses," that defendant shot Simms, and the defense witnesses testified defendant did not shoot Simms. Illinois case law establishes that the evidence presented by this record is insufficient to raise the self-defense issue. See *Freeman*, 149 Ill. App. 3d at 281 (and cases cited therein); *Diaz*, 101 Ill. App. 3d at 915. Accordingly, defendant has failed to demonstrate the trial court erred in refusing the instruction regarding self-defense.

¶ 67    We additionally observe that even assuming that the trial judge erred in refusing the instruction regarding self-defense, "instructional errors are deemed harmless if it is

demonstrated that the result of the trial would not have been different had the jury been properly instructed." *Washington*, 2012 IL 110283, ¶ 60 (citing *People v. Pomykala*, 203 Ill. 2d 198, 210 (2003)). In this case, the jury was presented with two versions of the incident. According to the State's witnesses, defendant was the aggressor, shooting Simms, who was unarmed. The shooting occurred after an argument between defendant and Simms had concluded and the two individuals had separated, without any evidence the dispute had escalated to threats of killing. Bush testified without contradiction that he attempted to retrieve car keys and not a handgun from Simms. Barnes testified that he saw defendant standing over Simms after the shooting. Evans testified that the shooter fled the parking lot in "some sort of red" vehicle and did not see Simms with a handgun. Rogers testified that the victim was unarmed. Rogers also testified the shooter fled in a maroon or burgundy Lumina or a vehicle of a similar model. Rogers did not observe Bush in possession of a handgun after running up to Simms.

¶ 68     On the other hand, the defense witnesses testified that Simms approached defendant and lifted his shirt, revealing a handgun, but a third party named Rico actually fired the shots that killed Simms. The defense witnesses, however, did not testify that Simms ever removed a handgun from his waistband. No handgun was recovered from Simms or Bush. Although the defense implied that Bush removed the handgun from Simms, the record contains no direct evidence to support the implication.

¶ 69     "In determining which of these accounts to believe, the trier of fact does not have to accept as true the testimony presented by the defendant concerning self-defense, but, rather, in weighing such evidence must consider the probability or improbability of the testimony, the circumstances surrounding the killing and other witnesses' testimony." *People v. Johnson*, 172 Ill. App. 3d 371, 377 (1988). The jury in this case, by its verdict, clearly accepted the version of the incident supported by the testimony of the State's witnesses and rejected the version supported by the testimony of the defense witnesses.

¶ 70     Moreover, even assuming the jury accepted the State's witnesses only to the extent it concluded defendant shot Simms, and accepted the defense testimony only to the extent that Simms approached defendant, lifted his shirt and placed his hand on a weapon in his waistband, the failure to give the self-defense instruction would have been harmless. In this case, defendant shot Simms multiple times. Thus, it is clear defendant could not have reasonably continued to fear death or great bodily harm after Simms was disabled. See *People v. Limas*, 45 Ill. App. 3d 643, 652 (1977); see also *People v. Lee*, 243 Ill. App. 3d 1038, 1043 (1993). The rule applies with greater force when, as here, the testimony of the defense witnesses does not establish that Simms withdrew a weapon from his waistband.

¶ 71     In short, the trial judge did not err in refusing to instruct the jury on the affirmative defense of self-defense. Moreover, any error in failing to give the instruction in this case would have been harmless beyond a reasonable doubt.


¶ 72                     Evidence of Flight or Concealment

¶ 73     Defendant next argues the trial court erred in allowing the State to introduce evidence and present closing argument that defendant was hiding from the police. "The fact of flight, when considered in connection with all other evidence in a case, is a circumstance which may be considered by the jury as tending to prove guilt." *People v. Lewis*, 165 Ill. 2d 305, 349 (1995). The inference of guilt which may be drawn from flight depends upon the knowledge

of the suspect that the offense has been committed and that he is or may be suspected. *Id.* The same principles apply to evidence of intentional concealment. See *People v. Hayes*, 139 Ill. 2d 89, 132 (1990). Defendant contends there was no foundation for such evidence in this case, and no evidence that he knew the police were searching for him. "It is within the discretion of the trial court to decide whether evidence is relevant and admissible and its decision will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the defendant." *Id.* at 130. Thus, we will not overturn a court's decision to admit evidence unless the decision is "arbitrary, fanciful or unreasonable." *People v. Hanson*, 238 Ill. 2d 74, 101 (2010).

¶ 74    "The consequential steps in the investigation of a crime and the events leading up to an arrest are relevant when necessary and important to a full explanation of the State's case to the trier of fact." *Hayes*, 139 Ill. 2d at 130. In *Hayes*, our supreme court ruled the trial court properly admitted testimony regarding the police investigation to explain the two-week delay between an identification and an arrest. *Id.* at 131. In this case, the evidence of the police investigation was similarly properly admitted to explain the delay in arresting defendant.

¶ 75    Evidence of the consequential steps in the investigation of a crime and the events leading up to an arrest, however, does not necessarily raise an inference of flight or intentional concealment. See *id.* at 132. Evidence that a defendant was aware that he was a suspect is essential to prove flight or intentional concealment. *Lewis*, 165 Ill. 2d at 350. Even so, "actual knowledge of [the defendant's] possible arrest is not necessary to render such evidence admissible where there is evidence from which such fact may be inferred." *Id.* Whether such knowledge may be inferred depends on the evidence presented in a given case. See *id.* at 350-51 (and cases cited therein).

¶ 76    In this case, Officer Powell, who had observed defendant selling shoes in the parking lot three or four times per week, never saw defendant return to the parking lot after the shooting. Sergeant Devine testified he contacted Sharina, along with several friends and relatives of defendant, regarding the shooting incident. In addition, Officer Mitchell testified regarding the surveillance of Sharina, who eventually was observed at a motel, loading luggage in her vehicle, which was then driven by defendant, who was also in possession of false identification. From this evidence, a jury could validly infer that defendant knew he was a suspect and that he consciously avoided the police. Accordingly, the trial court did not abuse its discretion in permitting the State to use such evidence to argue defendant was concealing himself and fleeing from the police.[14]

¶ 77    We also observe in passing that even assuming the argument regarding flight was improper, it would not warrant reversal unless it was such a material factor in defendant's conviction that the jury likely would have reached a contrary verdict had the remarks not been made. *People v. Witt*, 227 Ill. App. 3d 936, 945 (1992). As previously noted, flight is a *circumstance* which may be considered by the jury as tending to prove guilt. See *Lewis*, 165 Ill. 2d at 349. Flight is thus circumstantial evidence of guilt, not direct evidence. See *People v. Minish*, 19 Ill. App. 3d 603, 611 (1974). The jury in this case, by its verdict, accepted the testimony of the State's witnesses regarding the shooting and rejected the testimony of the

---

[14]Although not necessary to our conclusion, the State observes defendant asserted in his *pro se* posttrial motion that he attempted to contact the police investigating the shooting, from which it could be inferred that defendant knew the police sought to discuss the shooting with him.

defense witnesses. *Supra* ¶ 69. Accordingly, we conclude the jury would not have reached a contrary conclusion absent the evidence of flight. Thus, even assuming the State's argument was erroneous, the error would be harmless in this case.

¶ 78                                    Ineffective Assistance of Trial Counsel

¶ 79        Lastly, defendant contends the trial court erred by applying the wrong standard during its initial inquiry into his claims of ineffective assistance of trial counsel pursuant to our supreme court's decision in *Krankel*. In *Krankel*, the defendant filed a *pro se* posttrial motion alleging ineffective assistance of counsel, and the Illinois Supreme Court ruled that the trial court should have appointed him new counsel to represent him at a hearing on the motion. *Krankel*, 102 Ill. 2d at 187-89. Our supreme court subsequently clarified that the appointment of new counsel is not automatically required whenever a defendant files a *pro se* posttrial motion for a new trial based on an ineffective assistance claim. *People v. Moore*, 207 Ill. 2d 68, 77 (2003); *People v. Crane*, 145 Ill. 2d 520, 533 (1991). Instead, in such cases, the trial court must conduct a preliminary inquiry to examine the factual basis behind defendant's claim. If the claim is not meritorious, or if it solely concerns matters of trial strategy, then the court may deny the motion without appointing new counsel. *Moore*, 207 Ill. 2d at 77-78; see *People v. Ramey*, 152 Ill. 2d 41, 52 (1992) (trial court did not err in declining to appoint new counsel when defendant's claims were "spurious, related to trial tactics or not supported by the record"). It is only when the claim points to possible neglect of the case that new counsel must be appointed under *Krankel*. *Moore*, 207 Ill. 2d at 78.

¶ 80        In considering whether the trial court has met its duty under *Krankel*, "[t]he operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Id*. "[A] trial court's method of inquiry at a *Krankel* hearing is somewhat flexible." *Flemming*, 2014 IL App (1st) 111925, ¶ 84 (citing *People v. Fields*, 2013 IL App (2d) 120945, ¶ 40). "[T]he trial court may consider any facial insufficiency of the defendant's allegations and may (1) ask the defendant's trial counsel questions; (2) briefly discuss the allegations with the defendant; or (3) rely upon its own knowledge of counsel's performance." *Fields*, 2013 IL App (2d) 120945, ¶ 39 (citing *Moore*, 207 Ill. 2d at 78-79). We review the manner in which the trial court conducted its *Krankel* hearing *de novo*. *Flemming*, 2014 IL App (1st) 111925, ¶ 80 (citing *Moore*, 207 Ill. 2d at 75).

¶ 81        For example, in *Flemming*, the defendant argued the trial court improperly compressed the two steps of the *Krankel* process, effectively conducting a full hearing "where defense counsel testified for the State against her client and defendant was not represented by new counsel to protect his interests." *Flemming*, 2014 IL App (1st) 111925, ¶ 81. The *Flemming* court concluded the State's brief questioning of defense counsel at the trial court's direction was a proper preliminary inquiry consistent with the requirements of *Krankel*. *Id*. ¶¶ 82-85.[15]

---

[15]The record establishes that the hearing in this case was lengthy. The length of the hearing, however, was dictated by the number of allegations of ineffective assistance of counsel defendant presented at the hearing and the length of time defendant consumed in explaining them. In contrast, the responses from defense counsel were relatively brief. The trial judge's inquiry was not transformed from a preliminary one into a full hearing simply because defendant required the trial judge to consider numerous contentions of ineffectiveness.

¶ 82 Defendant claims the trial court applied the incorrect legal standard based upon the trial court's June 4, 2012, explanation of the process:

> "Do you remember me telling you about a *Krankel* [h]earing, how you could still allege [trial counsel] was ineffective; however, I would make that determination. If I determined that she was ineffective you would get a new lawyer. If I determined that she was not effective [*sic*], she would continue to represent you. You elected to go by yourself without having that *Krankel* [h]earing, okay?
>
> *A Krankel [h]earing would essentially be where you can make your allegation that she [counsel] was ineffective, and I would listen to each allegation you made and I would make a ruling as to whether or not she was ineffective, okay. But if I ruled that she was not ineffective she would still represent you.* You said you understood it and you said that you wished to represent yourself." (Emphasis added.)

In reviewing this claim, "[w]e must presume that a trial judge knows and follows the law unless the record demonstrates otherwise." *People v. Jordan*, 218 Ill. 2d 255, 269 (2006). Defendant relies upon the emphasized portion of the transcript to rebut the presumption.

¶ 83 When read in context, however, the trial court's comments refer to the May 31, 2012, discussion in which the trial court inquired whether defendant understood the court could consider the claim of ineffective assistance of trial counsel pursuant to *Krankel* while retaining representation for the posttrial motion. Reading the record as a whole, it is apparent the trial court was not attempting to give defendant a detailed explanation of what *Krankel* and its progeny require of the trial court, but was merely attempting to explain the *Krankel* process was available to defendant and did not require him to immediately discharge his trial counsel. Accordingly, the cited portions of the transcript do not rebut the presumption that the trial court knew and followed the law. *Jordan*, 218 Ill. 2d at 269.

¶ 84 Defendant also contends in his brief that "[h]ad the court applied the correct standard, it should have found that many of [defendant]'s claims showed possible neglect." The claims defendant raised, however, involved trial counsel's failure to call particular witnesses, ask witnesses particular questions, and to strike particular individuals from the jury.[16] Decisions about whether to call witnesses are generally considered matters of trial strategy and reserved to the discretion of trial counsel. *People v. Chapman*, 194 Ill. 2d 186, 231 (2000). Similarly, the manner in which counsel elects to examine witnesses is regarded as a matter of trial strategy and will not support an ineffective assistance of counsel claim unless the chosen tactic is objectively unreasonable. See, *e.g.*, *People v. Pecoraro*, 175 Ill. 2d 294, 326-27 (1997). Thus, when the defense attorneys affirmed their decisions were attributable to trial strategy, the trial court generally was entitled to accept those representations. See *Chapman*, 194 Ill. 2d at 230-31.[17]

[16]On appeal, defendant does not renew his claims regarding trial counsel's actions during jury selection. We observe, however, that trial counsel's actions during jury selection are also considered a matter of trial strategy and thus virtually unchallengeable. *People v. Manning*, 241 Ill. 2d 319, 333 (2011).

[17]Defendant argues that this court should treat the *Krankel* procedure similar to the examination of ineffective assistance of counsel claims in postconviction review, where arguments regarding trial strategy are inappropriate at the initial stage of review. See *People v. Tate*, 2012 IL 112214, ¶ 22. Defendant, however, cites no authority supporting his analogy. Our supreme court has specifically

¶ 85   Defendant argues the trial court's acceptance of counsel's assertions of trial strategy, without further questioning by the trial court or further explanation by defense counsel, did not constitute an adequate *Krankel* inquiry. We note the trial court was entitled to evaluate the adequacy of the claims of ineffective assistance of counsel on their face. See *Moore*, 207 Ill. 2d at 77-78; *Flemming*, 2014 IL App (1st) 111925, ¶ 80. " 'A defendant can overcome the strong presumption that defense counsel's choice of strategy was *sound* if counsel's decision appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy.' (Emphasis in original.)" *People v. Bryant*, 391 Ill. App. 3d 228, 238 (2009) (quoting *People v. King*, 316 Ill. App. 3d 901, 916 (2000)). Illinois courts also recognize that trial strategy will consider the costs and benefits of calling particular witnesses and pursuing particular questions. See, *e.g.*, *People v. Kubat*, 114 Ill. 2d 424, 433-34 (1986) (counsel could conclude testimony about the defendant's whereabouts before the crime would be of questionable value); *People v. McKenzie*, 263 Ill. App. 3d 716, 722 (1994) (defendant testifying would have subjected her to "full brunt of adversarial cross-examination" and could have produced liabilities which outweighed the benefits of her testifying); *People v. Williams*, 252 Ill. App. 3d 1050, 1059 (1993) (finding that trial counsel was not ineffective for failing to call alibi witnesses where counsel had interviewed the witnesses). *People v. Consago*, 170 Ill. App. 3d 982, 988 (1988) (certain portions of testimony could have been harmful to the defendant). Generally, "[t]he trial court's decision to decline to appoint new counsel for a defendant based on a judgment that the ineffective assistance claim is spurious shall not be overturned on appeal unless the decision is manifestly erroneous." *People v. McCarter*, 385 Ill. App. 3d 919, 941 (2008). With these principles in mind, we briefly consider the claims of ineffective assistance defendant raises on appeal.

¶ 86   First, the trial court did not require a detailed explanation from counsel of the limited benefits of calling Sharina to testify that she did not know she was under police surveillance. The State could have attacked defendant's wife as a biased witness and a possible accessory to defendant's attempted flight. Moreover, calling Sharina as a witness would have exposed her to further cross-examination by the State regarding any contact she had with defendant between the date of the shooting and the date of his arrest.

¶ 87   Similarly, the trial court did not require a detailed explanation of why counsel did not ask Rogers what Bush removed from Simms' pockets. Defendant did not contend Rogers would have testified Bush removed a weapon. Trial counsel informed the court Rogers had represented he would meet with defense counsel, but never did. Defense counsel is not required to question an uncooperative witness without knowing the substance of his testimony. Defense counsel may have sought to avoid the possibility that one of the defense witnesses would ultimately support the State's contention that Simms was unarmed.

¶ 88   The trial court also did not require a detailed explanation of why defense investigators did not expend more resources attempting to question Evans before trial. The record established Evans viewed the shooting from a distance and could not identify defendant as the shooter. Questioning whether Evans wears eyeglasses would have been of marginal benefit to the

---

allowed for the consideration of trial strategy during *Krankel* inquiries. *E.g.*, *Chapman*, 194 Ill. 2d at 230-31. We will follow the precedent established by our supreme court.

defense and counsel could reasonably have chosen to focus resources on more significant aspects of the case.

¶ 89    Moreover, the trial court did not require a detailed explanation of trial counsel's decision to not call Clinton Loggins or Richard Baines as witnesses. Counsel informed the court those decisions were made after interviewing Loggins and Baines during trial preparation.[18] Defense counsel was entitled to assess whether testimony from these witnesses, on balance, was likely to aid the defense case.

¶ 90    In addition, the trial court did not require a detailed explanation of trial counsel's decision to not verify whether defendant attempted to contact police prior to his arrest. As previously noted, the State could have relied on such evidence to argue defendant knew of the investigation but took no further steps to cooperate.

¶ 91    Lastly, the trial court did not require a detailed explanation of trial counsel's decision to not elicit testimony regarding whether defendant also sold cigarettes in the parking lot–which defendant maintains would show that competition over the shoe sales was not an adequate motive. The issue was collateral to the question of guilt or innocence in this case.

¶ 92    In short, the trial court conducted a *Krankel* inquiry, permitting defendant the opportunity to present each of the points raised in his *pro se* motion, followed on each point by a brief interchange between the court and defense counsel regarding the complained-of conduct, and concluding with the trial court's observation of defense counsel's performance at trial and the adequacy of defendant's allegations on their face. The trial court concluded he observed no ineffective assistance of counsel in this case. Defendant has failed to demonstrate this finding was manifestly erroneous. *McCarter*, 385 Ill. App. 3d at 941.

¶ 93                                    CONCLUSION

¶ 94    For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 95    Affirmed.

---

[18]Trial counsel also informed the trial court the decision to not call Baines as a witness was based upon various conversations with Baines, what other witnesses told counsel, and how counsel believed Baines would "come off on the stand."