2025 IL App (1st) 230992-U

No. 1-23-0992

Order filed July 8, 2025

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 19767 |
| | ) | |
| BARTHOLOMEW BISHOP, | ) | Honorable |
| | ) | Patrick K. Coughlin, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Van Tine and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Circuit court's dismissal of defendant's postconviction petition is affirmed where he did not make a substantial showing at the second stage of proceedings under the Post-Conviction Hearing Act that his trial counsel was ineffective.

¶ 2    Defendant Bartholomew Bishop appeals the circuit court's second-stage dismissal of his petition for relief filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). He argues he made a substantial showing that his trial counsel was ineffective. For the following reasons, we affirm.

¶ 3                                   I. BACKGROUND

¶ 4       Following a 2014 jury trial, defendant was convicted of first-degree murder for shooting and killing Marilyn Horton and attempted murder for shooting Leasha Crockett. He was sentenced to consecutive terms of 65 and 35 years' imprisonment, respectively.

¶ 5       Prior to trial, defendant indicated he would assert self-defense. The circuit court ordered the tender of Crockett's medical records and the Chicago Heights Fire Department records pertaining to Crockett's treatment. Defense counsel confirmed that he received 47 pages of medical records and, later, 27 additional pages of medical records.

¶ 6                                        A. Trial

¶ 7                                   1. *State's Case-in-Chief*

¶ 8       At trial, Crockett testified that she dated defendant on and off for about nine years. In May 2009, defendant left Crockett's car in Champaign. Crockett received parking tickets and threatened to report the car stolen if he did not return it. Defendant called and threatened to kill her if she did so. Crockett called the police. When they responded, defendant continued calling from a restricted number; an officer listened to what he said. A Chicago Heights police officer subsequently testified that he responded to Crockett's home and saw her receive 14 phone calls from a restricted phone number. He answered and identified himself and the caller did not speak.

¶ 9       Crockett further testified that, in September 2009, she and defendant lived in an apartment in Chicago Heights, along with Crockett's 10-year-old, developmentally-delayed son. Crockett had broken up with defendant because he had cheated on her and, for the second time, impregnated Tara Wheeler. Crockett told defendant to move out by September 24, 2009. Around this time, defendant threatened to beat Crockett if she did not perform oral sex on him.

¶ 10     On September 23, 2009, defendant asked Crockett if she was sure she wanted him to leave. She said yes. He choked her until her son entered the room and asked him to stop. The following day, defendant said she would have to "make him" leave. Crockett called the police and defendant left. A Chicago Heights police officer testified that he responded to the call, and Crockett said defendant had refused to leave. Crockett further testified that, over the next few days, defendant called to arrange for his belongings. She told him to send or bring someone else.

¶ 11     On September 28, 2009, Crockett and her son were at home. Horton was there celebrating with Crockett that Crockett's application to move into Horton's apartment building had been approved. Crockett and Horton were drinking and smoking marijuana in Crockett's bedroom. Crockett's son was in his own room. Someone knocked. Horton went to the door, returned, and told Crockett it was defendant. Crockett told Horton to call the police if she heard arguing. She answered the door. She pointed to a closet with defendant's belongings. They did not speak and Crockett returned to her bedroom. She sat on a futon and Horton sat in a chair next to the door.

¶ 12     A few minutes later, defendant entered Crockett's bedroom. He stated he was homeless and asked her for bus fare. She refused and "bent down to ash the blunt." She heard Horton crying, looked up, and saw defendant holding a pistol. He said to get on the floor, and Horton did. Horton offered to get him some money. Defendant refused, as she would call the police and he had not come for her but for "this b***," referring to Crockett. He said Horton was in the wrong place at the wrong time. Crockett did not get on the floor, pleaded with defendant, and tried to stop Horton from crying to avoid agitating defendant. Crockett's son entered the room. Defendant put the firearm to her son's head and again told her to get on the floor. She complied

and asked him not to hurt her son. He took her son to his room, turned down the lights in the apartment, and returned to Crockett's bedroom.

¶ 13    Crockett said the blunt was burning her and she needed to rise and put it out. She sat up. Defendant approached and tried to hit her with the firearm. She blocked the blow and they began struggling. Crockett managed to stand, and they broke apart. She lunged towards a cracked-open window to yell for help. Defendant shot her in the chest. Crockett lunged toward the window again and yelled for help. Defendant shot her again. Defendant shot her nine times in her left arm and twice in her right arm. Crockett dropped to the floor. Horton lay on the floor crying. Defendant left the room for a few seconds then returned. He asked for Crockett's phone and purse and she said she did not know where they were. She saw him fire several times towards Horton, who was still on the floor. Crockett heard him leave the apartment.

¶ 14    Crockett went for help. She ultimately encountered her neighbor Pamela Bonadona and told Bonadona that defendant had shot her. Bonadona staunched the bleeding from Crockett's chest. Crockett was transported to a hospital in an ambulance. As a result of the shooting, she had a scar on her chest, nine scars on her left arm, two scars on her right arm, and a steel plate in her shoulder. She counted her scars to the jury.

¶ 15    On cross-examination, Crockett confirmed that she had said defendant shot her arm nine times. She denied hearing nine shots hit her arm but remembered seeing nine wounds in her arm. Counsel asked, "You didn't know if you were shot nine times. You just have nine scars?" Crockett responded, "I know I was shot nine times in my arm because that's what the doctor told me." She did not remember whether the two shots in her right arm were "separate shots." She did

not remember how many shots she heard or saw defendant fire but knew "it was several times" and that he "shot numerous times."

¶ 16    Bonadona testified that she was in her home, heard a gunshot, and several seconds later heard six more gunshots. She ultimately encountered Crockett outside, who said "Bart" shot her. Bonadona, a retired nurse, saw wounds to Crockett's chest and left arm, which was "completely shattered."

¶ 17    A third Chicago Heights police officer testified that he responded to the scene and saw Crockett bleeding from her chest. She told him that defendant shot her.

¶ 18    An investigator with the Illinois State Police testified that he processed Crockett's apartment and found eight shell casings and two fired bullets in the master bedroom, a bullet hole in the window of that room, and another shell casing in the bathroom. He further testified that a casing and bullet are not always left behind when a bullet is fired.

¶ 19    An assistant Cook County medical examiner testified that Horton suffered five gunshot wounds, including one to her head that was surrounded by soot but no gunpowder stippling, indicating that the muzzle of the firearm was in contact with her scalp when fired.

¶ 20    David Kline, a former Bourbonnais police officer testified that, on October 15, 2009, he responded to a call that a person had overdosed. The person was unresponsive, and Kline testified it was defendant. Others at the scene said defendant's name was Bartholomew Sandifer. Defendant was taken to a hospital. The paramedics relayed that defendant said his name was Merlin Moss. A search for that name returned a Champaign County warrant. Kline went to the hospital and defendant said his name was Merlin Moss. Kline told him there was a warrant attached to that name. Defendant then stated his name was Anthony Bishop. Kline learned that

an alias for "Merlin Moss" was Bartholomew Bishop, who was wanted for murder in Chicago Heights. Kline asked defendant why Chicago Heights police might be looking for him. Defendant began crying and admitted he was Bartholomew Bishop.

¶ 21                                    2. *Defendant's* Lynch *Witness*

¶ 22     During the State's case, the parties informed the court that defense counsel intended to call Wheeler, the woman whom defendant had impregnated while dating Crockett, as a witness to provide evidence of prior violent acts by Crockett pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984). Counsel proffered that Wheeler would testify that, in 2008, she lived with defendant and Crockett, and Crockett threatened her and defendant with a knife due to her and defendant's relationship. The State objected, as counsel had not raised the proposed evidence before trial. Counsel stated he had just recently learned the specifics of Wheeler's testimony. The court reserved ruling until after the State rested.

¶ 23     After the State rested, counsel explained he had spoken with Wheeler and defendant and decided not to call Wheeler as a witness. Defendant confirmed he agreed with the decision. The court stated that it would allow defendant to testify to the same incident Wheeler would have, to corroborate his state of mind at the time of the shooting.

¶ 24                                    3. *Defendant's Case-in-Chief*

¶ 25     Defendant testified that, in 2008, he lived with Crockett and Wheeler. Crockett became aware of his sexual relationship with Wheeler. Crockett and Wheeler would fight. Once, when defendant refused to "kick [Wheeler] out," Crockett grabbed a knife and threatened to hurt them. She went upstairs, where Wheeler was located. Defendant called the police. Officers arrived and

went upstairs but could not find a knife. Crockett moved out, and in March or April 2008, defendant moved back in with her, while still dating Wheeler.

¶ 26    On September 28, 2009, after Crockett had made him move out, defendant returned for his belongings. Crockett opened the closet door where his things were and returned to the bedroom with Horton. Crockett's son left his room and called defendant's name. Defendant hugged him and went to Crockett's bedroom. He complained that she had complicated his retrieval of his belongings. Crockett responded, "F--- you, Bart. I hate you. I don't care about your stuff."

¶ 27    Defendant asked Crockett if Horton had told her that defendant and Horton were "messing around." Horton told Crockett she was sorry. Crockett approached defendant and started "swinging" at him. They struggled for a moment until Crockett's son asked them to stop. Defendant bent to talk to him, and Crockett grabbed a firearm from defendant's back waistband. He heard a gunshot and pushed Crockett's son out of the way. He heard three or four more shots. He saw Crockett pointing the gun at his face, and she said she hated him. Horton, who had been in the chair, was now on the floor.

¶ 28    Defendant "went for the gun," and he and Crockett struggled over it. As they struggled, the firearm discharged a few times, and defendant thought Crockett was struck in her shoulder and arm. When it struck her arm she released the firearm and fell. Defendant was never in control of the firearm; Crockett's hands were on the firearm and his hands were around hers.

¶ 29    Defendant told Crockett he would get help and left. He panicked and discarded the firearm in an alley, as he was a felon and it was unregistered. He had obtained the gun for protection because he spent time in dangerous areas. He had brought it to Crockett's because he

was taking all his belongings to his new home. After discarding the gun, he made a phone call and started back to the apartment when he saw police vehicles. He learned that Horton had died, that he was wanted for murder and attempted murder, and that he should leave and get a lawyer. He left and took a bus to Hammond, Indiana, where he had been staying.

¶ 30    In closing argument, defense counsel argued that Crockett's testimony was inconsistent with the number of shell casings recovered from the scene. He noted she testified she was shot 12 times, the medical examiner testified Horton was shot five times, and there was a bullet hole in the window, but only nine shell casings were found, and one of those was in the bathroom. Further, defendant's testimony comported with the number of shell casings, Horton's wounds, and gunshots Bonadona heard.

¶ 31    In rebuttal, the State noted that Crockett's arm was "riddled with scars." The State argued that defendant was "pouncing on [Crockett] for the mere fact that she doesn't even know how many times she was shot. That's what she told you. She doesn't know." Rather, all she knew was the number of wounds she suffered and what a doctor told her. The State repeated that, "She doesn't know how many times she was shot. That's what she told you."

¶ 32    The jury found defendant guilty of first-degree murder and attempted murder.

¶ 33                                B. Post-Trial Motions

¶ 34    Defendant filed several *pro se* post-trial motions. Relevant here, he argued that his counsel was ineffective for misleading him into agreeing not to call Wheeler as a *Lynch* witness by telling him Wheeler was drunk and high. Defendant filed an affidavit from Wheeler in which she stated that counsel had "asked [her] about Champaign and then told [her] to hold on, come back to [her] and said he wasn't going to use [her]." He also filed affidavits from several others,

who averred that they had never seen Wheeler intoxicated, and she did not appear intoxicated on the day she went to court.

¶ 35    At a hearing, counsel explained that Wheeler would have testified that Crockett had been aggressive toward her and defendant. However, on the day she was set to testify, she appeared "severely under the influence of some type of drug or alcohol," and her testimony would not have been from her own recollection. "[P]rimarily" because of Wheeler's condition, counsel discussed with defendant whether to call her as a witness; he and defendant decided they would not. Defendant agreed that he had decided she should not testify but later learned she had been sober. Counsel noted that Wheeler's testimony would have been cumulative to defendant's.

¶ 36    The court denied defendant's post-trial motions. The court sentenced defendant to consecutive terms of 65 and 35 years' imprisonment for murder and attempted murder.

¶ 37                                    C. Appeal

¶ 38    Defendant appealed. He argued, in part, that the court erred in failing to appoint him new counsel on his post-trial ineffective assistance claim, pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). See *People v. Bishop*, 2017 IL App (1st) 141775-U, ¶¶ 3, 115. We disagreed and affirmed defendant's convictions. *Id.* ¶ 138. In doing so, we noted that counsel stated that he did not call Wheeler to testify because he believed she was intoxicated and that her testimony would not be based on personal knowledge; defendant's disagreement with that decision did not establish ineffective assistance. *Id.* ¶ 128. Further, Wheeler's affidavit did not speak to her sobriety when she met with defense counsel or whether her testimony would have been based on personal knowledge. *Id.* ¶¶ 130, 132. Even so, whether Wheeler was actually intoxicated was not

the "controlling question," as trial counsel's decision that her testimony would not help defendant's case, for the reasons given, was a matter of trial strategy. *Id.* ¶ 131.

¶ 39                                    D. Postconviction Proceedings

¶ 40    On March 17, 2018, defendant filed a *pro se* postconviction petition. Relevant here, he argued that trial counsel provided ineffective assistance for failing to (1) investigate, interview, and call Wheeler as a *Lynch* witness and (2) impeach Crockett with statements she made at the crime scene that were inconsistent with her testimony. He also argued that counsel's cumulative errors rendered his assistance ineffective, even if any one of them did not individually.

¶ 41    Defendant attached two 2017 affidavits from Wheeler. She averred that, in 2011, defendant told her his counsel would speak with her, but counsel never contacted her. Wheeler came to court on February 6, 2014, and spoke with counsel for the first time. She told him Crockett had threatened and assaulted her in December 2007 and January 2008, including once with a knife. Counsel stated he did not need her to testify. He asked if she was under the influence of drugs and alcohol, and she denied it. She had been sober and ready to testify.

¶ 42    In an affidavit of his own, defendant averred that his family brought Wheeler to court to meet with counsel during trial. Counsel spoke with Wheeler, then told defendant that she was intoxicated and it was not in defendant's best interest for her to testify. Defendant trusted counsel, as he could not see Wheeler. After trial, he learned Wheeler was sober, but counsel told her defendant did not want her to testify.

¶ 43    As to Crockett, defendant averred in another affidavit that he requested that counsel investigate statements Crockett made at the crime scene that were inconsistent with her grand jury testimony. Through a Freedom of Information Act request he obtained police reports, which

included a statement from a paramedic that he requested that counsel present at trial. He also alleged that he had requested Crockett's medical reports from counsel, but counsel refused to provide them, and attached affidavits averring he had sent counsel and co-counsel letters requesting the records in May 2017.

¶ 44      Defendant attached a supplemental report from a detective memorializing statements from a paramedic. According to the paramedic, the victim stated that she allowed defendant into her apartment to remove personal items. An argument ensued and defendant drew a handgun and placed it to the head of the victim's son. The victim pleaded with him and moved her son out of the way. He shot the victim twice. Her friend entered the apartment and defendant said she was in the wrong place at the wrong time and shot at her.

¶ 45      Defendant attached another police report in which an officer wrote that he spoke with a woman at the scene of a shooting who said that defendant shot her. The officer observed a gunshot wound to her chest. While at the hospital, the officer learned that the victim suffered one gunshot wound to her chest and one gunshot wound to her left arm.

¶ 46      On April 20, 2018, the circuit court docketed defendant's petition for second-stage proceedings and appointed postconviction counsel.

¶ 47      On April 25, 2018, defendant filed a *pro se* motion to supplement his petition. He claimed that trial counsel was ineffective for failing to impeach Crockett's testimony—that defendant shot her 12 times—with her medical records, which counsel "had access to" and which showed that Crockett was lying about the number of times she was shot. He claimed the medical records stated Crockett was shot between two and four times. He did not attach any

medical records, and on May 3, 2018, he filed a *pro se* motion for discovery requesting them. The record does not indicate whether the court ruled on that motion.

¶ 48    On March 9, 2022, postconviction counsel filed a certificate pursuant to Rule 651(c) (Ill. S. Ct. R. 651(c) (eff. July 1, 2017)) asserting that she had consulted with defendant, reviewed his initial petition and supplement, examined the record, and determined that his *pro se* petition adequately set forth his claims.

¶ 49    The State moved to dismiss the petition. The State argued that defendant's claim regarding Wheeler had been litigated after trial and concerned a matter of trial strategy, and his claim regarding Crockett's prior statements was also a matter of trial strategy.

¶ 50    Following a hearing, the circuit court dismissed defendant's petition. In a written order, the court found that defendant's claim regarding Wheeler was barred by *res judicata*, as it was litigated post-trial and on direct appeal. His claim regarding Crockett's prior inconsistent statements was waived, as it could have been raised on appeal, and counsel could have validly exercised trial strategy in deciding not to introduce her prior statements, as they comported with her testimony that defendant had shot her and Horton.

¶ 51                                    II. ANALYSIS

¶ 52    Defendant appeals, arguing that he made a substantial showing that trial counsel was ineffective for failing to (a) investigate and present Wheeler's testimony as *Lynch* evidence and (b) impeach Crockett's testimony that she was shot 12 times with her prior inconsistent statements that she was shot twice.

¶ 53    The Act provides a three-stage process for a criminal defendant to challenge his conviction on the grounds of a constitutional violation. *People v. Roland*, 2023 IL 128366, ¶ 25.

Where, as here, a petition advances to the second stage, the State may move to dismiss the petition. *Id.*; see 725 ILCS 5/122-5 (West 2018). The circuit court then determines whether the defendant, in his petition and accompanying documentation, made a substantial showing of a constitutional violation. *Roland*, 2023 IL 128366, ¶ 25. A defendant makes a substantial showing when his allegations, if proven at a third-stage evidentiary hearing, would entitle him to relief. *People v. Domagala*, 2013 IL 113688, ¶ 35.

¶ 54    In determining whether a petition's allegations suffice to invoke relief, we liberally construe the allegations and take them as true. *People v. Sanders*, 2016 IL 118123, ¶ 31. We must accept all factual allegations as true unless they are positively rebutted by the record. *People v. Johnson*, 2017 IL 120310, ¶ 14. However, the defendant must attach to his petition "affidavits, records, or other evidence supporting the petition's allegations or state why the same are not attached." *Sanders*, 2016 IL 118123, ¶ 45; see 725 ILCS 5/122-2 (West 2018). We review second-stage dismissals *de novo*. *People v. Agee*, 2023 IL 128413, ¶ 34.

¶ 55                              A. *Lynch* Evidence

¶ 56    Defendant argues he made a substantial showing that trial counsel was ineffective for failing to investigate and present Wheeler's testimony that Crockett had violent tendencies. See *Lynch*, 104 Ill. 2d at 200 (when a defendant claims self-defense and there are conflicting accounts of what happened, evidence of victim's violent character supports the defendant's account). He notes that Wheeler's new affidavits establish that she was sober when she met counsel at the courthouse and told counsel that Crockett had threatened and abused her, including threatening her with a knife. He claims the affidavits therefore create a credibility issue regarding Wheeler's sobriety that must be resolved at an evidentiary hearing.

¶ 57    Initially, the State asserts that this claim is barred by *res judicata*, as whether counsel was ineffective for failing to call Wheeler as a witness was litigated and decided during posttrial proceedings and on direct appeal. See *People v. Huff*, 2024 IL 128492, ¶ 18 (any issue raised and decided on direct appeal is barred by *res judicata*). Defendant responds that, at the time of the *Krankel* inquiry, Wheeler had not yet averred that she was sober when she met trial counsel. See *Bishop*, 2017 IL App (1st) 141775-U, ¶ 130 (noting that the affidavit Wheeler prepared before the *Krankel* inquiry did not speak to her sobriety). Given that defendant's previous arguments were rejected due in part to an absence of evidence that Wheeler was sober, which defendant has now presented in the form of her new affidavits, we decline to apply the bar of *res judicata*.

¶ 58    To establish a claim of ineffective assistance of counsel, a defendant must meet the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), by demonstrating that (1) counsel's performance was deficient, and (2) he was prejudiced by counsel's deficient performance. *Roland*, 2023 IL 128366, ¶ 26.

¶ 59    Defendant has not made a substantial showing that counsel performed deficiently in not calling Wheeler as a witness. To establish deficient performance, the defendant must show that counsel's performance was "objectively unreasonable under prevailing professional norms." *Id.* The decision to call a witness is a matter of trial strategy and will not ordinarily support an ineffectiveness claim, as courts are highly deferential to such decisions. *People v. Peterson*, 2017 IL 120331, ¶ 80.

¶ 60    Even a mistake in trial strategy does not render counsel's representation constitutionally defective. *Id*. Rather, it will only constitute deficient performance if counsel's strategy was so unsound that he failed to conduct meaningful adversarial testing of the State's case. *Id.* In other

words, there is a strong presumption that counsel's strategy was sound, and that presumption is only overcome where no reasonably effective attorney in similar circumstances would pursue that strategy. See *id.* (citing *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 85).

¶ 61   We must accept as true Wheeler's averment in her affidavits that counsel was wrong about her being intoxicated at the courthouse. See *Johnson*, 2017 IL 120310, ¶ 14. But as we noted on direct appeal, whether counsel was correct that Wheeler was intoxicated is not the "controlling question." *Bishop*, 2017 IL App (1st) 141775-U, ¶ 131. Rather, we consider whether counsel was correct in not presenting Wheeler to the jury.

¶ 62   Presenting an intoxicated witness to the jury could harm counsel and defendant's credibility or confuse the jury. Thus, the fact that Wheeler appeared "severely" intoxicated to counsel was a valid strategic reason not to present her to the jury, even if counsel was incorrect about Wheeler's condition. Wheeler's testimony, at a third-stage evidentiary hearing, that she was not intoxicated when she spoke to counsel would not affect the reasonableness of counsel's decision in February 2014 that it was unwise to put her on the witness stand where she appeared to be intoxicated. See *Domagala*, 2013 IL 113688, ¶ 35 (question at second stage is whether, if allegations in petition were proven at an evidentiary hearing, defendant would be entitled to relief).

¶ 63   Nor has defendant made a substantial showing of prejudice by any failure of counsel to investigate Wheeler before trial or call her as a witness. A defendant must affirmatively prove that prejudice resulted from counsel's errors. *People v. Johnson*, 2021 IL 126291, ¶ 55. To demonstrate prejudice, there must be a reasonable probability that, absent counsel's deficient performance, the result of the proceeding would have been different. *Roland*, 2023 IL 128366,

¶ 26. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.* The question is not whether counsel's performance affected the outcome or whether it is conceivable that a reasonable doubt could have been established had counsel behaved differently. *Id.* ¶ 28. Rather, the question is whether it is "*reasonably likely* that the result of the proceedings *would have been different*." (Emphasis in original.) *Id.* Here, we find that it would not have been.

¶ 64    Wheeler was not present for the events on September 28, 2009. Thus, she could not testify that Crockett was the initial aggressor or that the events transpired the way defendant testified. Further, her testimony that Crockett threatened defendant and Wheeler with a knife the year prior would have been cumulative, as defendant testified about the same event. Wheeler's testimony also would not discredit Crockett's accounts of the prior instances in which defendant had threatened or inflicted violence on Crockett, which made his self-defense claim less credible. Those included threatening to kill her if she reported her car stolen in May 2009, threatening to beat her unless she performed oral sex on him earlier in September 2009, and on September 23, 2009, choking her when she confirmed she wanted him to move out. Her making him move out was the same source of tension between them on September 28, 2009, the day of the shooting. Wheeler was not present for any of those events.

¶ 65    The evidence also showed that defendant fled from the scene, discarded the weapon, and provided false names when he later overdosed. That evidence additionally undercut his self-defense claim. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 59 (flight from scene, discarding weapon and telling others he could get "45 to life" indicated guilty state of mind and knowledge that defendant did not act in self-defense); *People v. Wilburn*, 263 Ill. App. 3d 170, 178-79 (1994) (flight from scene and disposal of weapon belied self-defense claim). Wheeler's

proffered testimony would not corroborate defendant's testimony that he took those actions for fear of being discovered as a felon in possession of a firearm, as opposed to escaping accountability for the shootings. Nor would it corroborate defendant's testimony that the reason he took the firearm to Crockett's was because he was moving his possessions to a new home.

¶ 66 To underscore the lack of prejudice, we reiterate what we said on direct appeal during a plain-error analysis, where we noted that "the evidence was not closely balanced." *Bishop*, 2017 IL App (1st) 141775-U, ¶ 90. We found that "defendant's version of events here was not credible in light of the injuries suffered by Crockett," as defendant would have the jury believe that "Crockett had control of the weapon during the entire struggle, but somehow shot herself" repeatedly, while "defendant somehow suffered no injuries at all, despite the fact that, according to him, Crockett repeatedly fired his gun at him." *Id*. ¶ 89.

¶ 67 It is not reasonably likely that the result of defendant's trial would have been different had Wheeler testified to the contents of her affidavit. Defendant has not made a substantial showing of prejudice.

¶ 68                          B. Crockett's Prior Inconsistent Statements

¶ 69 Next, defendant argues that he made a substantial showing that trial counsel was ineffective for failing to impeach Crockett with evidence that she stated on the scene that she had been shot twice when she testified at trial she had been shot 12 times. He notes that the supplemental report by a detective indicates that Crockett told a paramedic that defendant shot her twice. Another police report he attached states that the reporting officer encountered Crockett, who said that defendant shot her. The officer observed a gunshot wound to her chest. Later, while at the hospital, the officer learned that Crockett suffered two gunshot wounds, one to

her left arm and one to her chest. At trial, the State did not present independent medical evidence about the number of times Crockett was shot.

¶ 70    The State asserts that defendant has forfeited this claim as he could have raised it on direct appeal. See *Huff*, 2024 IL 128492, ¶ 18 (claim that could have been raised on direct appeal is procedurally defaulted under the Act). But the State does not sufficiently explain how defendant could have raised this claim on direct appeal given that the basis for defendant's claim, the police reports, were not in the record on direct appeal. Thus, we will consider the merits of defendant's claim.

¶ 71    The impeachment and cross-examination of a witness is a matter of trial strategy for which we afford counsel deference. *People v. Pecoraro*, 175 Ill. 2d 294, 326-27 (1997); *People v. Bell*, 2021 IL App (1st) 190366, ¶ 79. But we have held that failing to impeach a significant witness with a prior inconsistent statement that counsel knew or should have known about may be deficient performance. See, *e.g.*, *People v. Salgado*, 263 Ill. App. 3d 238, 246-47 (1994).

¶ 72    Defendant argues that counsel was deficient for failing to offer evidence of Crockett's prior inconsistent statements after he attempted to impeach her but she denied making them. See *People v. Anderson*, 2018 IL App (1st) 150931, ¶ 24 (if party attempts to impeach witness with prior statement and witness denies making statement, party must offer evidence of statement). But the record reveals no such exchange. Counsel asked Crockett, "You didn't know if you were shot nine times. You just have nine scars?" She replied that she knew she had been shot nine times in her arm because her doctor had told her as much. We do not read that exchange as asking Crockett about a prior inconsistent statement she made before trial, and Crockett in her answer did not deny or equivocate about a statement she had made before trial.

¶ 73    Further, and more significantly, the police reports do not establish that Crockett was wrong or lying about the number of times she had been shot. They only establish that she stated after the shooting that she had been shot twice. At trial, Crockett testified that her doctor told her how many times she had been shot. Thus, it is plausible that she was mistaken at the scene about the number of times she had been shot, before learning the correct number from her doctor. We are not convinced of the impeachment value of her statements. See *People v. Jimerson*, 127 Ill. 2d 12, 33 (1989) (when considering counsel's performance regarding a failure to impeach, "[t]he value of the potentially impeaching material must be placed in perspective").

¶ 74    To add to this point, though defendant alleged in his supplemental motion that the medical records showed Crockett was shot two to four times, and he argues on appeal that the record does not confirm that counsel reviewed them, defendant did not attach any of Crockett's medical and treatment records to his petition. The record reflects that counsel informed the court that he received two sets of medical records, and we presume he reviewed them. Without the records, we are unable to verify whether they comport with Crockett's testimony about the number of times defendant shot her. If they did, counsel would have known there was little point in impeaching her with prior inconsistent statements on that point.

¶ 75    We also conclude that counsel could have valid reason not to introduce Crockett's prior statements based on the other content in the statements that comported with her testimony— namely, that defendant had shot both her and Horton and held a firearm to her son's head. Those events would have occurred just before Crockett made the potentially impeaching statements, and she had not yet been treated for her wounds before making the prior inconsistent statements. Counsel may have decided not to introduce the prior inconsistent statements to avoid reminding

the jury of Crockett's condition when she made the statements and thus highlight that, despite those circumstances, her description of defendant's conduct largely comported with her trial testimony. See *Bell*, 2021 IL App (1st) 190366, ¶¶ 82-83 (counsel was not objectively unreasonable for declining to impeach witness about prior inconsistent statement where benefit could have been outweighed by reminding jury of witness's injuries at the time of statements). Thus, defendant has not made a substantial showing that counsel performed deficiently.

¶ 76    Nor has defendant made a substantial showing of prejudice. Again, the record indicates that Crockett made her prior inconsistent statements before being treated by a doctor who told her about the number of times she had been shot. She counted her scars for the jury. Further, in rebuttal, the State conceded that Crockett did not know how many times she had been shot besides what the doctor told her and the number of wounds she suffered. The jury nevertheless found defendant guilty. As the State never denied that she may have been mistaken about the number of times she was shot, it is not reasonably likely that the outcome of the trial would have differed had counsel brought out that, immediately after the shooting, Crockett stated she had only been shot twice. Defendant has not made a substantial showing of prejudice.

¶ 77                                          C. Cumulative Error

¶ 78    Defendant's final claim of cumulative error fails, as we have found no *Strickland* violation among defendant's claims. The evidence of guilt was overwhelming, and defendant's version of events was not remotely credible. The court properly dismissed the petition.

¶ 79                                          III. CONCLUSION

¶ 80    We affirm the judgment of the circuit court.

¶ 81    Affirmed.